**Affirmed; Opinion Filed July 16, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-16-01412-CV

### IN THE INTEREST OF JA.D.Y. AND JU.D.Y., CHILDREN

**On Appeal from the 255th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-15-09887**

## MEMORANDUM OPINION
Before Justices Lang, Fillmore, and Schenck
Opinion by Justice Lang

Jeffrey Damon Younger ("Younger") appeals from the trial court's annulment of his marriage with Anne Georgulas ("Georgulas") and an award of $45,045.11 in damages to Georgulas. In two issues on appeal, Younger argues (1) the evidence is legally and factually insufficient to support the trial court's findings of fact relating to the annulment and fraud claims, and (2) the damage award of $45,045.11 is "unjustified." We conclude the evidence is legally and factually sufficient and the trial court did not err in awarding damages of $45,045.11.

### I.      Factual and Procedural Background

Younger and Georgulas were married on December 5, 2010. Before the marriage, Georgulas was the sole parent of two adopted girls. Together, Younger and Georgulas parented twin boys who were born in 2012. In February of 2015, Georgulas testified she asked Younger to "move out" of her house. Younger did not "move out" of the house until April of 2015. Georgulas filed her original petition for divorce on May 21, 2015 citing "[t]he marriage ha[d] become

insupportable because of discord or conflict of personalities between [Younger and Georgulas]." On October 10, 2016, Georgulas filed a second amended petition for divorce that included a request for annulment and claims for fraud and theft.

The case was tried to the court on October 18, 2016. During the trial, Georgulas testified that after Younger moved out she found out several facts about him she did not know prior to the marriage. Specifically, Georgulas learned Younger "had been married twice" when Georgulas was only aware of one previous marriage, that he "lied to her" about his military experience, he "did not earn anywhere close" to the income he told Georgulas he earned while the couple were married, he had "taken unemployment probably several times in his life," he did not have a college degree, and he was not a professor. Georgulas stated if she had known about the second previous marriage, she "very likely would not have married [Younger]" and that "part of the reason" she was marrying Younger was because she thought Younger "was a person who had an ability to do what he said and to succeed in life."

There was also testimony from Blake Mitchell, Ph.D., a psychologist who previously conducted a child custody evaluation report and performed a psychological examination of Younger and Georgulas for a separate child custody issue. The issues respecting the children are not the subject of this appeal. The custody evaluation report was admitted into evidence. Dr. Mitchell testified that Younger admitted to him that he "misstated or lied" to Georgulas about his "history" as to his education, previous marriages, military experience, employment, and to telling Georgulas "mistruths." Dr. Mitchell also testified that, in his opinion, if Younger had been "more honest" the relationship "likely would not have proceeded."

Georgulas testified that, during the marriage, her business issued a check in the amount of $45,045.11 to purchase a truck from Sam Pack's Five Star Ford. A copy of the check for that purchase was admitted into evidence. The title of the truck was put in Younger's name. A copy of

that title was also admitted into evidence. Georgulas testified Younger sold the truck without Georgulas's permission after she and Younger separated. Younger testified Georgulas "bought [the the truck] for [him]" and acknowledged he "sold [the truck]."

Before the marriage, Georgulas and Younger created and signed a premarital agreement. That agreement stated in relevant part:

> Any property that is acquired by either [Younger or Georgulas] during our marriage, regardless of the source of the consideration exchanged for the property, will be owned only as the separate property of the party in whose name the title is taken and will be free of any claim of reimbursement on the part of the other.

Following a bench trial, a "Memorandum Ruling" was rendered on October 18, 2016 that annulled the marriage and awarded "actual damages" to Georgulas of $45,045.11. On November 9, 2016, the trial court signed a "Final Decree of Annulment and Judgments" that awarded Georgulas, in relevant part, (1) an annulment and (2) "actual damages" of $45,045.11 resulting from Younger's sale of a truck.

After request of this Court, the trial court rendered findings of fact and conclusions of law on February 27, 2017.

## II. The Annulment

### A. Standard of Review

#### 1. Legal and Factual Sufficiency of the Trial Court's Findings of Fact

In an appeal from a bench trial, findings of fact have the same weight as a jury's verdict. *See Speer v. Presbyterian Children's Home & Serv. Agency,* 847 S.W.2d 227, 233 n.4 (Tex. 1993); *see also Anderson v. City of Seven Points,* 806 S.W.2d 791, 794 (Tex. 1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in reviewing the evidence supporting a jury's answer. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam); *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). When the

–3–

appellate record contains a reporter's record, findings of fact are not conclusive and are binding only if supported by the evidence. *Sheetz v. Slaughter*, 503 S.W.3d 495, 502 (Tex. App.—Dallas 2016, no pet.). "Unchallenged findings of fact are binding on an appellate court, unless the contrary is established as a matter of law or there is no evidence to support the finding." *Walker v. Anderson*, 232 S.W.3d 899, 907 (Tex. App.—Dallas 2007, no pet.); *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986).

When a party challenges the legal sufficiency of an adverse finding on which it did not have the burden of proof, it must "demonstrate on appeal that no evidence supports the adverse finding." "When reviewing the record, we determine whether any evidence supports the challenged finding." *Sheetz*, 503 S.W.3d at 502. We will sustain a legal sufficiency challenge if "the evidence offered to prove a vital fact is no more than a scintilla." *Merrell Dow Pharms., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997). "Evidence does not exceed a scintilla if it is so weak as to do no more than create a mere surmise or suspicion that the fact exists." *Walker v. Anderson*, 232 S.W.3d 899, 907 (Tex. App.—Dallas 2007, no pet.).

When challenging the factual sufficiency of the evidence supporting an adverse finding upon which the appealing party did not have the burden of proof, the party "must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence." *Dow Chem. Co.*, 46 S.W.3d at 242. When a party challenges the factual sufficiency of the evidence on an issue, an appellate court considers all the evidence supporting and contradicting the finding of fact. *See Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). "Findings may be overturned only if they are so against the great weight and preponderance of the evidence as to be clearly wrong and unjust." *Ortiz*, 917 S.W.2d at 772; *see also Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam); *Sheetz*, 503 S.W.3d at 502.

### *B.  Applicable Law*

A trial court may annul a marriage if "(1) the other party used fraud, duress, or force to induce the petitioner to enter into the marriage; and (2) the petitioner has not voluntarily cohabited with the other party since learning of the fraud or since being released from the duress or force." TEX. FAM. CODE ANN. § 6.107 (West 2006).

Fraudulent inducement is established by proving that a false material misrepresentation was made that (1) was known to be false when it was made; (2) was intended to be acted upon; (3) was relied upon; and (4) caused injury. *Desta v. Anyaoha*, 371 S.W.3d 596, 600 (Tex. App.—Dallas 2012, no pet.).

An actionable representation "must be a representation of a material fact." *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930-31 (Tex. 1983). "A representation is 'material' if it is important to the party to whom it is made in making a decision regarding the particular transaction." *Burleson State Bank v. Plunkett*, 27 S.W.3d 605, 613 (Tex. App.—Waco 2000, pet. denied). "Whether a statement is an actionable statement of 'fact' or merely one of 'opinion' often depends on the circumstances in which a statement is made." *Transport Ins. Co. v. Faircloth,* 898 S.W.2d 269, 276 (Tex.1995).  "When a speaker purports to have special knowledge of the facts, or does have superior knowledge of the facts—for example, when the facts underlying the opinion are not equally available to both parties—a party may maintain a fraud action." *Paull v. Capital Res. Mgmt., Inc.,* 987 S.W.2d 214, 219 (Tex. App.—Austin 1999, pet. denied); *Matis v. Golden*, 228 S.W.3d 301, 307 (Tex. App.—Waco 2007, no pet.).  "While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986).

"Since intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence." *Id.* at 435.

In a suit for a dissolution of a marriage, the husband and the wife are competent witnesses for and against each other. TEX. FAM. CODE ANN. § 6.704 (West 2006). If the husband or wife testifies, the court trying the case shall determine the credibility of the witness and the weight to be given to the witness's testimony. *Id.* In a bench trial, the trial court, as factfinder, is the sole judge of the credibility of the witnesses. *See Sheetz*, 503 S.W.3d at 502; *Fulgham*, 349 S.W.3d at 157.

### C. Application of the Law to the Facts

Younger contends the evidence is "legally and factually insufficient" to support the trial court's findings of fact and conclusions of law that Georgulas was induced by fraud to enter into the marriage. Specifically, Younger challenges findings of fact 3–19. For purposes of our decision, we quote findings of fact 3, 5, 7, 8, 9, 10, 16, 17, 18, and 19 and the arguments made by the parties regarding those findings below.[1]

1. Finding of Fact number 3: "Before marriage, [Younger] lied to [Georgulas] about former marriages."

Younger argues his testimony renders this finding "inconclusive" because he testified that Georgulas's daughters "used to make fun of [his] wife's name because her nickname was Yolie…[s]o people were clearly aware of my first wife." However, the record shows Georgulas testified that she was only aware of one previous marriage and that she only found out after she and Younger separated that Younger "had been married twice." Also, Georgulas stated she "thought it was important to contact [the other wife] because [she] did not know about her." Finally, Georgulas testified if she had known about the second marriage, she "very likely would

---

[1] Based on our analysis of these findings, we do not need to consider the remainder of the findings Younger challenges on this appeal.

not have married [Younger]." Accordingly, we conclude there is legally and factually sufficient evidence to support this finding.

2. Finding of Fact number 5: "Before the marriage, [Younger] lied to [Georgulas] about his education."

Younger concedes the record contains no evidence that is in conflict with this finding. However, Younger argues "that even if [he] exaggerated his educational accomplishments" and "[exaggerations of accomplishments, character, and circumstances] constitute a species of fraud, they do not afford a basis for destruction of the marriage."

The record shows Georgulas testified that "the day" she and Younger met, and "many times between then and when [they] were married" Younger told Georgulas "he had gone to the University of Dallas and received two degrees…[a]nd that he had been getting his PhD at the University of North Texas." Also, Georgulas testified she learned after she and Younger separated that Younger did not have a college degree. We conclude there is legally and factually sufficient evidence to support this finding.

3. Finding of Fact number 7: "Before the marriage, [Younger] lied to [Georgulas] about being a teacher at the University of North Texas."

As to this finding, Younger argues he "testified otherwise" and that "the status of [this] claim is inconclusive." However, the record shows Younger testified he "told [Georgulas] that [he] taught math…at UNT." Additionally, the record reflects Georgulas testified Younger told her "he had taught intermediate math at the University of North Texas as part of his PhD program," and that he "had flunked students and [would come in the classroom] and sa[y] I don't care if you pass or fail. That's not my job. I'm just here to teach you." We conclude there is legally and factually sufficient evidence to support this finding.

4. Finding of Fact number 8: "Before the marriage, [Younger] lied to [Georgulas] about his service in the Marines."

Younger contends he "testified otherwise" and that he "was in the Marines over 35 years ago" and, therefore, "[n]one of [the information about the Marines] is relevant for an annulment now." In his testimony, Younger stated he told Georgulas "the truth" about being in the Marines. However, the record shows Georgulas testified Younger told her before they got married that he "was a career Marine," he had been in the Marines for "five or six years," and he lost a $250,000 job "because he had to fight in the Iraq war." According to Georgulas, after she and Younger separated, she learned Younger "had been in the Marines for a very short period of time and because he was under age, he got removed from the Marines." Accordingly, we conclude that there is legally and factually sufficient evidence to support this finding.

5. Finding of Fact number 9: "Before the marriage, [Younger] lied to [Georgulas] about [Younger's] military experience in the Army."

Younger argues he "testified otherwise" to this finding and that he "was in the Army over 30 years ago" and therefore "none of [the information about the Army] is relevant for an annulment now."

The record reflects Georgulas testified that, before they were married, Younger did not tell her he was in the army. According to Georgulas, she found out after they separated that Younger had been in the army and was discharged due to an "[a]dmission of homosexuality." The record shows Younger testified he did not "mention much about the Army" during the marriage, but acknowledged he was discharged from the army due to admission of homosexuality. We conclude that there is legally and factually sufficient evidence to support this finding.

6. Finding of Fact number 10: "Before the marriage, [Younger] lied to [Georgulas] about his prior income and earnings."

Younger argues he "testified otherwise" to this finding and did not lie to Georgulas about his income because while he lived "overseas, [he had] a large income exemption" of $120,000 a year. Georgulas testified Younger told her before they were married that he "had worked for

Fortune 500 companies" and he made between $100,000 and $225,000 a year "during most of the nineties and part of the 2000s."

The record contains a copy of Younger's Social Security earnings record that shows Younger earned in excess of $100,000 only in the year 2000. Younger contends the Social Security earnings record does not reflect his actual earnings because of the "income exemption."

According to Georgulas, "part of the reason" she was marrying Younger was because she thought Younger "was a person who had an ability to do what he said and to succeed in life." We conclude there is legally and factually sufficient evidence to support this finding of fact.

7.  Finding of Fact number 16: "Before the marriage, [Younger] lied to [Georgulas] about his unemployment."

8.  Finding of Fact number 17: "Before the marriage, [Younger] lied to [Georgulas] about not taking unemployment compensation."

9.  Finding of Fact number 18: "Before the marriage, [Younger] lied to [Georgulas] about taking government assistance."

Younger makes one argument as to findings 16, 17, and 18, contending he "testified otherwise" to the findings and he "never spoke to [Georgulas] about such things prior to marriage." However, the record shows Georgulas testified Younger told her he "had never been unemployed," he "had worked since he was 12 years old," and he never took "any assistance from the government." Georgulas said she learned after she and Younger separated that Younger "not only had…taken unemployment probably several times in his life" but that "the day before [Younger and Georgulas] met was the last time [Younger] had been on unemployment." We conclude there is legally and factually sufficient evidence to support findings of fact 16, 17, and 18.

10. Finding of Fact number 19: "[Georgulas] did not cohabitate with [Younger] since learning of the fraud and lies listed above in [findings of fact nos.] 3 through 18."

Younger argues Georgulas's "attorney friend" "looked [Younger] up" while Georgulas and Younger were still living together and therefore this is evidence that Georgulas "continue[d] to

cohabit with [Younger] with full knowledge of the putative fraudulent representations." However, Georgulas testified she did not cohabitate with Younger after "finding out" his fraud. We conclude there is legally and factually sufficient evidence to support this finding.

As indicated above, the evidence supports the trial court's findings supporting conclusions that Younger committed fraud by inducing Georgulas into marriage. Younger denied Georgulas's allegations, and in some cases testified to the contrary. However, the trial court is the sole judge of the credibility of the witnesses and it was permitted to believe Georgulas's testimony and reject Younger's testimony. *See Desta,* 371 S.W.3d at 599 ("The court could reasonably believe Husband's testimony, and that of his witnesses, and reject Wife's testimony, and conclude Husband was induced by fraud to enter into the marriage."). The trial court did not err in rendering a judgment annulling the marriage. Younger's first issue is decided against him.

### III. Damages

#### A. Applicable Law

"A premarital agreement becomes effective on marriage." TEX. FAM. CODE ANN. § 4.004 (West 2006). Section 4.007 of the Texas Family Code provides that if a marriage is determined to be void, an agreement that would otherwise have been a premarital agreement is enforceable only to the extent necessary to avoid an inequitable result. TEX. FAM. CODE ANN. § 4.007 (West 2006). "A suit for annulment presumes that there never was a valid marriage and that therefore it should be declared void." *Garcia v. Garcia*, 232 S.W.2d 782, 783 (Tex. Civ. App.—San Antonio 1950, no writ). "Wide latitude and discretion rests" with the trial courts in equitable claims and "that discretion should only be disturbed in the case of clear abuse." *Murff v. Murff*, 615 S.W.2d 696, 700 (Tex. 1981).

## B. Application of the Law to the Facts

In his second issue, Younger contends the award of $45,045.11 is "unjustified." Younger first asserts that if the marriage is not void by annulment, the premarital agreement is legally enforceable and therefore "[i]t does not matter that [a]ppellee's business paid for the truck. Title is the exclusive determiner of ownership, and the truck title is in [a]ppellant's name only." However, we concluded above the evidence is sufficient to affirm the trial court's annulment of the marriage. Therefore, we conclude the premarital agreement is unenforceable. *See* TEX. FAM. CODE ANN. § 4.004 (West 2006).

Younger claims in the alternative that if the marriage is void by annulment, section 4.007 of the Texas Family Code applies. Section 4.007 states "[i]f a marriage is determined to be void, an agreement that would otherwise have been a premarital agreement is enforceable only to the extent necessary to avoid an inequitable result." Younger argues that "in the interests of avoiding inequity – the Court should enforce the [p]remarital [a]greement" and "reverse the judgment for the truck." He contends he "own[ed] the truck as a gift for helping [Georgulas's] business…and [the truck] was titled in [Younger's] name with full knowledge of [Georgulas]."

The record reflects that during trial, Georgulas orally requested that the court "reimburse" her company for "the amount of the truck at the time of the purchase." Georgulas testified her company bought the truck for $45,045.11, she believed "the titling in [Younger's] name was fraudulent," she "didn't agree to let [Younger] title [the car] in his name," and she "didn't agree to let [Younger] sell [her] company truck." Therefore, on this record, we conclude the trial court did not abuse its discretion in concluding the premarital agreement was unenforceable and Georgulas was entitled to reimbursement of $45,045.11. Younger's second issue is decided against him.

## IV.    Conclusion

We conclude the evidence is legally and factually sufficient to support the trial court's judgment that granted annulment of the marriage. Further, the trial court did not err when it awarded damages of $45,045.11 to Georgulas.

The trial court's judgment is affirmed.

/Douglas S. Lang/

DOUGLAS S. LANG
JUSTICE

161412F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF JA.D.Y. AND
JU.D.Y., CHILDREN

No. 05-16-01412-CV

On Appeal from the 255th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. DF-15-09887.
Opinion delivered by Justice Lang. Justices
Fillmore and Schenck participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is

**AFFIRMED**.

Judgment entered this 16th day of July, 2018.