**REVERSE and RENDER; and Opinion Filed August 31, 2016.**



In The

# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-14-00982-CV

**WILLIAM D. SHEETZ, Appellant**
**V.**
**YOLANDA SLAUGHTER, Appellee**

**On Appeal from the County Court at Law No. 1**
**Dallas County, Texas**
**Trial Court Cause No. 08-10401-A**

## OPINION

Before Justices Bridges, Lang-Miers, and Schenck
Opinion by Justice Bridges

William Dean Sheetz appeals the trial court's judgment in favor of Yolanda Slaughter on her claims under the Texas Deceptive Trade Practices Act[1] (DTPA). In five issues, Sheetz argues the trial court erred in making findings of fact and conclusions of law and entering judgment on a theory of agency that was not pled in Slaughter's pleadings nor tried by consent; the evidence was legally and factually insufficient to show that Sheetz permitted Harry Davis to practice law without a license; and the evidence was legally and factually insufficient to show Sheetz violated the DTPA by his own actions. We reverse the trial court's judgment and render judgment that Slaughter take nothing on her claims.

---

[1] Although Slaughter alleged legal malpractice and breach of warranty claims in her petition, her only recovery was under the DTPA.

In February 2006, Slaughter purchased a home and borrowed $231,726. Her mortgage payment was $1427.24 per month. Slaughter "was a month behind from the beginning" of the mortgage because the mortgage was sold to Wells Fargo, and an agreement concerning the due date of her first payment "didn't transfer." In November 2006, Slaughter had received a demand letter saying she was behind on her mortgage in the amount of $7100.

In January 2007, Slaughter met with Harry Davis, who had sent Slaughter a letter in which he claimed he could help with her home foreclosure. Davis said "his job was to call the bank and see if they could remodify the loan." Slaughter paid Davis an initial fee of $950 and signed an employment agreement with Davis. The agreement did not state that Slaughter would be able to keep her home. Slaughter's home was posted for foreclosure the next month, and Davis said Slaughter needed a lawyer "to keep the mortgage company out so that they can then go forward with trying to remodify the loan." On January 22, 2007, Davis sent Slaughter a letter stating his company had "successively [sic] completed [Slaughter's] request for Mortgage Assistance with [her] current mortgage servicer Wells Fargo Home Loans." The letter stated Slaughter would receive supporting documentation within a few days, and the documents would "outline a payment arrangement for three months at your regular mortgage payment of $1,427.00." The letter advised Slaughter it was "very important that [she] make all mortgage payments on time to avoid foreclosure to be re-instituted [sic] due to late payment." Slaughter did not make any further payments.

Davis called Slaughter on February 3 and set up a meeting at his office with a licensed attorney, Sheetz, and Slaughter. At the meeting, Slaughter gave Sheetz $1500. Sheetz said he was going to file an application for a temporary restraining order and work closely with Davis and the mortgage company "to remodify the loan so that [Slaughter] wouldn't lose [her] house." Neither Sheetz nor Davis said they would succeed in having Slaughter's loan modified.

–2–

Likewise, there is no evidence that Davis was aware of any valid legal theory that would permit Slaughter to remain in her home without paying her mortgage. Slaughter agreed to pay Sheetz $450 per month. During the entire representation, Slaughter had only two conversations with Sheetz: the first at the February 3 meeting and the second on January 5, 2008 after Slaughter received the foreclosure letter telling her she had fifteen days to move out. Slaughter believed she signed an employment agreement with Sheetz, but she did not have a copy of it.

In March 2007, Slaughter went back to school and received a stipend of $5500 per semester "for residency" because she was not living on campus. At that time, Slaughter was working as a bartender every other weekend for a company that leased out bartenders and security officers. Slaughter had also received $7500 from the Internal Revenue Service. In total, Slaughter had $13,000 in cash in March 2007. Neither Sheetz nor Davis asked Slaughter if she had the money to reinstate her loan.

On June 13, 2007, Davis sent Slaughter a letter informing her that Wells Fargo "did not comply with our Qualified Written Request to find a resolution to [her] mortgage loan situation." The letter stated Slaughter "accepted our attorney to represent [her] in conjunction with the attorney fees being structured on a suitable payment plan on February, 2007." The letter warned Davis had "no choice but to inform our attorney to get the necessary documentation to dismiss" Slaughter's case because of her "non-compliance with our firm and the attorney's office to whom we have advanced money on [her] behalf."

On August 6, 2007, Sheetz sent Slaughter a letter informing her that Wells Fargo's motion for summary judgment had been granted on July 9, 2007. The letter explained this meant that Slaughter could no longer contest the issue nor file a new lawsuit alleging the same facts and legal theories. A copy of the court's order was enclosed with the letter. The letter explained that August 8, 2007 was the deadline for filing a motion for new trial or notice of appeal and, if either

of these events did not occur thirty days from the order dated July 9, 2007, Slaughter would not be able to appeal the case. The letter concluded as follows:

> At this time my representation in your legal matter ends. I have not been retained to represent you on any appeal that you may file nor any motion for new trial. Should you wish to discuss your case further with me please do not hesitate to contact me or your housing counselor. Thank you for the opportunity to represent you in this matter. I wish you the very best, especially under these difficult circumstances.

On August 8, 2007, Slaughter filed a pro se motion for new trial.

On multiple occasions, Davis told Slaughter that he was not a licensed attorney. In November 2007, Davis told Slaughter she "needed to pay more money," but Slaughter refused because Davis and Sheetz had not done the things they promised. In Slaughter's opinion, Sheetz "basically turn[ed] [her] case over to be run by Harry Davis."

At the time of the foreclosure in January 2008, Slaughter still had approximately $13,000 in cash, but she did not mention this to Sheetz or Davis. It "never occurred" to Slaughter to tell Sheetz or Davis that she had "money coming in," but "it would occur to [her] that in their position they would ask" her if she had money.

In December 2008, Slaughter filed her original petition alleging Sheetz, Davis, and First Home Counseling made express warranties to her, engaged in an unconscionable course of action, and engaged in the unauthorized practice of law in violation of the DTPA. The petition further alleged Davis and First Home violated the Texas Debt Collection Act, and Sheetz committed legal malpractice. The petition alleged Slaughter hired First Home and Davis in January 2007 to assist her in stopping the foreclosure on her home and that Davis and First Home in turn hired attorney Sheetz on behalf of Slaughter to represent her in the matter. Slaughter's petition alleged Sheetz filed a petition seeking an injunction to stop the foreclosure action, which was granted. The petition also detailed the course of the earlier proceeding.

Counsel for the lender, Wells Fargo, served discovery on Sheetz on March 19, 2007. Sheetz did not timely respond to the discovery requests, and Wells Fargo filed a motion for summary judgment based on deemed admissions. Sheetz contacted Wells Fargo seeking an extension of the time for filing discovery responses because of a medical problem. Wells Fargo agreed to give Sheetz until June 18, 2007 to complete discovery. However, Sheetz failed to respond to discovery until June 19, 2007. On the day of the hearing on Wells Fargo's summary judgment motion, Sheetz filed a motion for continuance which was denied. On July 9, 2007 the trial court granted summary judgment against Slaughter. Sheetz took no action other than filing the motion for continuance, did not file a motion to set aside the deemed admissions, and did not file a response to the motion for summary judgment. Wells Fargo foreclosed on Slaughter's home on January 1, 2008. Slaughter alleged, "pursuant to an affidavit signed by Harry Davis," that Davis and First Home were "primarily and significantly involved in the preparation of [her] discovery responses." Slaughter alleged Davis and First Home "regularly engage in assisting their clients [sic] file petitions in an effort to avoid foreclosure on their homes." Davis' affidavit states that "My staff and I assisted Ms. Slaughter and Mr. Sheetz in complying with the Discovery deadline" of June 18, 2007.

At a non-jury trial, Sheetz testified he had an agreement with Davis that Sheetz would file lawsuits to stop foreclosures as needed. Davis and his employees "were allowed to type up pleadings," and Sheetz then made sure that "everything was appropriate" and prepared to go forward with the lawsuit. Sheetz created "the facts and allegations and legal theories" which he put on paper, and Davis' staff "would type [his] work up." Sheetz testified Slaughter did not pay him $1500 cash, but he received a $750 check from Davis' company after he obtained the temporary restraining order.

When asked what she thought was "a fair amount" for the trial court to award her as damages, Slaughter answered, "[m]y house would be a fair amount because if it wasn't for him I would still have my house. Now, if you're asking me what I thought my house was worth it was worth $179,000." Slaughter agreed a $50,000 award "would be appropriate" for "the disruption of [her] life, the destruction of [her] credit and the mental anguish that this whole thing has caused [her]," and she was asking the trial court to award her "$40,000 against Bill Sheetz."

Trial concluded on July 6, 2010. On July 17, 2013, the trial court entered judgment awarding Slaughter $40,000 against Sheetz. That judgment, however, was interlocutory because it did not dispose of Slaughter's claims against Davis and his company. On April 28, 2014, the trial court signed a judgment disposing of all parties and claims. Sheetz appealed. In December 2014, we abated this appeal for overdue findings of fact and conclusions of law, which were filed on December 31, 2014.

In its findings of fact and conclusions of law, the trial court found, among other things, that Slaughter paid Sheetz a $1500 retainer; Sheetz "knew and acquiesced in" Davis and his company "drafting initial documents for use in the foreclosure lawsuit"; Sheetz failed to timely and comprehensively respond to discovery, and the opposing party obtained summary judgment against Slaughter as a result; Sheetz directed and allowed Davis and his company to respond to discovery requests "without supervision despite their not being licensed to practice law"; although Sheetz accepted funds for legal services, he failed to perform the services for which he was retained; Sheetz acted in an unconscionable manner by agreeing to represent Slaughter and failing to do so and "having/hiring or fee sharing with unlicensed incompetent individuals who actually did the work his [sic] behalf"; Sheetz had Davis respond to the late outstanding discovery requests and "undertake the transmission of the same to opposing counsel in the TRO case"; Sheetz never inquired as to Slaughter's ability to cure the default in her mortgage; Sheetz

–6–

was a producing cause of Davis and his company practicing law without a license; and Sheetz did not enter into a written fee agreement with Slaughter and thus expressly or impliedly allowed Davis and his company "to engage in the unlawful practice of law on his behalf."

Based on these findings, the court concluded the following: Sheetz admitted that Davis and his company were "engaged in drafting and filing of pleadings as well as other activities generally considered to be the practice of law"; Davis and his company engaged in the unauthorized practice of law; Sheetz was aware of and aided and abetted Davis and his company in the unauthorized practice of law; Davis sent a letter to Slaughter indicating that if she failed to pay outstanding legal fees Sheetz would withdraw from representation in her lawsuit; Slaughter was a consumer under the DTPA; Sheetz and Davis and his company engaged in an unconscionable course of conduct regarding Slaughter; the unconscionable course of conduct engaged in by Sheetz violated the DTPA; Sheetz's actions were performed intentionally and/or knowingly; Sheetz's negligent acts or omissions breached the duty that arose from the scope of the attorney-client relationship he had with Slaughter; the breach proximately caused Slaughter's injury; and the unauthorized practice of law is actionable under the DTPA.

In his first issue, Sheetz argues the trial court erred in making findings of fact and conclusions of law and entering judgment on a theory of agency that was not pled in Slaughter's pleadings nor tried by consent. Specifically, Sheetz reiterates his argument made at trial that Slaughter's counsel never argued that Sheetz and Davis "were in some kind of conspiracy" and "it was some kind of agency." In his brief, Sheetz frames the "issue of agency" as whether "Sheetz permitted Davis to practice law without a license," an issue answered in the affirmative by the trial court's finding that "Sheetz was aware of and participated in the activities which were the unlawful practice of law by Defendant Davis/First Home Consulting."

–7–

At trial, Slaughter's counsel argued the evidence supported "a claim under the DTPA as a producing cause of Mr. Davis' practicing law without a license." Sheetz's counsel argued that the issue of agency was not tried by consent, and Slaughter's pleadings did not allege Davis and Sheetz "were in some kind of conspiracy" or that "it was some kind of agency." Slaughter's counsel asked for a trial amendment. The trial court deferred ruling, requesting that the parties research the issue and provide that information to the court. In his post-trial motion for instructed verdict and incorporated brief, Sheetz argued all amended pleadings in the case were ordered to be filed by September 25, 2009, and Slaughter's counsel did not request a trial amendment until the first day of trial on June 30, 2010. Sheetz argued the agency issue was not raised in Slaughter's pleadings, and a written pleading was required to support Slaughter's agency claim. *See Prater v. State Farm Lloyds*, 217 S.W.3d 739, 741 (Tex. App.—Dallas 2007, no pet.) (order permitting amendment is required; court may not grant motion post-judgment).

"A trial amendment must be filed as a written pleading; an oral statement at trial is insufficient to modify the pleadings." *City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 73 (Tex. 2000). However, a party waives its complaint of the pleading's failure to be in writing by failing to object to this defect in the pleading. *Id.* Here, Sheetz objected at trial that Slaughter's pleadings failed to raise the agency issue. After trial, Sheetz objected to the fact that no written pleading raised the agency issue. Thus, Sheetz timely objected to Slaughter's raising of the agency issue and preserved his complaint of the purported trial amendment's failure to be in writing. *Id.* Because no written pleading supported the trial court's consideration of the agency issue, we conclude the trial court erred to the extent it considered the issue. *See id.* We sustain Sheetz's first issue.

In his second and third issues, Sheetz challenges the legal and factual sufficiency of the evidence to support the trial court's findings and conclusions that Sheetz permitted Davis to practice law without a license.

In an appeal from a bench trial, the trial court's findings of fact have the same weight as a jury verdict. *Fulgham v. Fischer*, 349 S.W.3d 153, 157 (Tex. App.—Dallas 2011, no pet.). When the appellate record contains a reporter's record as it does in this case, findings of fact are not conclusive and are binding only if supported by the evidence. *Id.* We review a trial court's findings of fact under the same legal and factual sufficiency of the evidence standards used when determining if sufficient evidence exists to support an answer to a jury question. *Id.* (citing *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994)). When an appellant challenges the factual sufficiency of the evidence on an issue, we consider all the evidence supporting and contradicting the finding. *Id.* (citing *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989)). We set aside the finding for factual insufficiency only if the finding is so contrary to the evidence as to be clearly wrong and manifestly unjust. *Id.* (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam)). In a bench trial, the trial court, as factfinder, is the sole judge of the credibility of the witnesses. *Id.* As long as the evidence falls "within the zone of reasonable disagreement," we will not substitute our judgment for that of the fact-finder. *Id.* (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005)).

When an appellant challenges the legal sufficiency of an adverse finding on which he did not have the burden of proof at trial, he must demonstrate there is no evidence to support the adverse finding. *Id.* When reviewing the record, we determine whether any evidence supports the challenged finding. *Id.* If more than a scintilla of evidence exists to support the finding, the legal sufficiency challenge fails. *Id.*; *see also King Ranch, Inc. v. Chapman*, 118 S.W.3d 742,

751 (Tex. 2003) (more than a scintilla of evidence exists when evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions").

We review de novo a trial court's conclusions of law. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). We are not bound by the trial court's legal conclusions, but the conclusions of law will be upheld on appeal if the judgment can be sustained on any legal theory supported by the evidence. *Fulgham*, 349 S.W.3d at 157-58. Incorrect conclusions of law will not require reversal if the controlling findings of fact will support a correct legal theory. *Id.* Moreover, conclusions of law may not be reversed unless they are erroneous as a matter of law. *Id.*

Here, the evidence showed Sheetz was hired on February 3, 2007 to file a temporary restraining order and work closely with Davis and the mortgage company "to remodify the loan so that [Slaughter] wouldn't lose [her] house." Sheetz testified he had an agreement with Davis that Sheetz would file lawsuits to stop foreclosures as needed. Davis and his employees "were allowed to type up pleadings," and Sheetz then made sure that "everything was appropriate" and prepared to go forward with the lawsuit. Sheetz created "the facts and allegations and legal theories" which he put on paper, and Davis' staff "would type [his] work up." Thus, the pleadings were created and signed by Sheetz, a licensed attorney. Neither Davis nor his staff did more than "type [Sheetz's] work up." There is no evidence to support the trial court's finding that the legal work done in the foreclosure case "had been performed in significant part by Defendant Davis/First Home Consulting even though [Sheetz] knew that Defendant Davis/First Home Consulting was not a law firm, had no employees who were licensed to practice law and did not work under the supervision of a lawyer." *See Fulgham*, 349 S.W.3d at 157–58; *see also King Ranch, Inc.*, 118 S.W.3d at 751. On the contrary, the record shows the legal work in the foreclosure case was done by Sheetz and completed under his supervision.

Similarly, Davis and his staff assisted Sheetz in complying with the discovery deadline and mailed the completed discovery using an overnight delivery service. Davis' affidavit shows Sheetz was involved in the discovery process and Davis and his staff were merely assisting Sheetz. There is no evidence to show, as the trial court found, that Sheetz "directed and allowed Defendant Davis/First Home Consulting to respond to discovery responses without supervision despite their not being licensed to practice law." *See Fulgham*, 349 S.W.3d at 157–58; *see also King Ranch, Inc.*, 118 S.W.3d at 751.

As to the trial court's conclusion of law that "Defendant Davis/First Home Consulting sent a letter to Slaughter indicating that if she failed to pay outstanding legal fees that Sheetz would withdraw from representation in her lawsuit," this conclusion does not implicate Sheetz. The trial court made no finding that an agency relationship existed between Sheetz and Davis such that Davis' letter could somehow be attributable to Sheetz. We conclude that, whether or not the trial court held Sheetz accountable for the unlawful practice of law of Davis and his company under an agency theory, there is no evidence to show that any unlawful practice of law occurred. *See Fulgham*, 349 S.W.3d at 157–58; *see also King Ranch, Inc.*, 118 S.W.3d at 751. We sustain Sheetz's second issue. Because of our disposition of these issues, we need not further address the arguments made in his third issue.

In his fourth and fifth issues, Sheetz argues the evidence is legally and factually insufficient to support the trial court's findings and conclusions that he violated the DTPA by his own actions. We agree. Slaughter alleged Sheetz's actions constituted an "unconscionable course of action" that violated the DTPA.[2] TEX. BUS. & COM. CODE ANN. § 17.50(a)(3) (West

---

[2] Although Slaughter's petition also alleged Sheetz "breached express warranties made to her" in violation of the DTPA, none of the trial court's findings of fact or conclusions of law refer to a breach of warranty. Instead, all of the findings of fact and conclusions of law related to a DTPA violation refer to unconscionable conduct, including the trial court's conclusion that Slaughter was entitled to recover $50,000 in damages for Sheetz's unconscionable course of conduct. Accordingly, we do not address whether the evidence would have supported a recovery under the DTPA for breach of warranty.

2011). Slaughter alleged "Engaging in the unauthorized practice of law can be a violation of the DTPA." We have already concluded no evidence of the unauthorized practice of law was presented in this case. Under these circumstances, we conclude there is no evidence to support the trial court's finding that Sheetz's own actions violated the DTPA. *See Fulgham*, 349 S.W.3d at 157-58; *see also King Ranch, Inc.*, 118 S.W.3d at 751. We sustain Sheetz's fourth issue. Because of our disposition of this issue, we need not further address Sheetz's fifth issue.

The dissent concludes that the trial court's judgment rests on legal malpractice grounds in addition to the DTPA and that Sheetz's inadequate briefing constituted a waiver of our review of the trial court's judgment on the legal malpractice claim. The underlying case was not tried on a legal malpractice theory, and the testimony was all centered on an attempt to prove that Davis was involved in the unauthorized practice of law made possible by Sheetz. There was no attempt to show Slaughter would have kept her home or not suffered any emotional damages but for the actions of Sheetz, which is required in a legal malpractice case. Indeed, she identified no legal or factual theory that Sheetz might have developed in the underlying case that would have resulted in her keeping her home despite her default. Slaughter pursued relief at trial, as Sheetz urges to us, solely on the theory that Sheetz had violated the DTPA by outsourcing his law license.

In closing argument, Slaughter's counsel argued "our theory of recovery" was that, "if Sheetz had done what he was supposed to have done, he would not have allowed Harry Davis to go out and practice law without a license." Counsel argued there was "enough evidence to support a DTPA claim" against Sheetz, and "that is the claim under which we would like the Court to render judgment."

In his brief, Sheetz first argues the following:

In Count 1 of her petition, Slaughter alleged that Sheetz and Davis breached express warranties to her in violation of TEX. BUS. & COM. CODE § 17.50(a)(2) and that the facts alleged above constituted an unconscionable course of action as defined by TEX. BUS. & COM. CODE § 17.45(5) and made a violation by TEX. BUS.

–12–

& COM. CODE § 17.50(a)(3). At trial, however, this theory mutated into Sheetz somehow allowing Davis to practice law without a license.

The petition included Texas debt collection act violations (Count 2) and legal malpractice (Count 3), but these causes of action were not mentioned in the trial court's findings of fact and conclusions of law or in the judgment.

The trial court's finding of fact and conclusions of law concerning violation of the DTPA and unauthorized practice of law were as follows:

8. Defendant Davis/First Home Consulting engaged in the unauthorized practice of law

10. Sheetz was aware of and aided and abetted Defendant Davis/First Home Consulting in the unauthorized practice of law

12. Slaughter was a consumer as that term is defined in Tex. Bus. & Comm. Code § 17.00 et. seq.

13. Sheetz and Defendant Davis/First Home Counseling engaged in an unconscionable course of conduct regarding Slaughter

14. The unconscionable course of conduct engaged in by Sheetz was in violation of the Tex. Bus. & Comm. Code § 17.45(5) and in violation of § 17.50 (a)(3)

15. Slaughter is entitled to recover $50,000 in damages, as allowable under Tex. Bus. & Comm. Code § 17.50(b)(1)

16. Sheetz' actions were performed intentionally and/or knowingly as defined in the DTPA such that Slaughter is entitled to recover additional damages pursuant to Tex. Bus. & Comm. Code § 17.50(b) and/or 17.50(h)

20. The unauthorized practice of law is actionable under the DTPA

In addition, the trial court made the following conclusions of law:

17. Sheetz and Slaughter had an attorney-client relationship

18. Sheetz's negligent acts or omissions breached the duty that arose from the scope of the attorney-client relationship

19. The breach proximately caused Slaughter's injury

The rules of appellate procedure provide that briefing rules are to be construed liberally. TEX. R. APP. P. 38.9. Unchallenged findings of fact are binding on the appellate court, unless the contrary is established as a matter of law or there is no evidence to support the finding. *Bundren*

–13–

*v. Holly Oaks Townhomes Ass'n, Inc.*, 347 S.W.3d 421, 429–30 (Tex. App.—Dallas 2011, pet. denied).

Conclusions 17, 18, and 19 could be read as supporting a claim of legal malpractice. However, the trial court's findings of fact and conclusions of law do not mention "legal malpractice," and conclusions 17, 18, and 19 are sandwiched in between conclusions regarding the DTPA. In his brief, Sheetz not only asserts that no finding of legal malpractice was made but also argues his handling of Slaughter's case was not negligent. A legal malpractice claim is based on negligence, which requires proof of both damages and proximate causation, among other things. *Kelley & Witherspoon, LLP v. Hooper*, 401 S.W.3d 841, 847 (Tex. App.—Dallas 2013, no pet.). There is no evidence of damages resulting from Sheetz's malpractice, and the trial court made no finding of fact or conclusion of law that an award of damages was established as a result of any legal malpractice. In a legal-malpractice case, damages consist of the amount of damages recoverable and collectible if the suit had been properly prosecuted. *Elizondo v. Krist*, 415 S.W.3d 259, 263 (Tex. 2013). Legal-malpractice damages are the difference between the result obtained for the client and the result that would have been obtained with competent counsel. *Id.* Here, the result obtained, foreclosure, was inevitable considering Slaughter's failure to pay her mortgage in the past and her refusal to pay in order to bring the loan current. Under these circumstances, we conclude Slaughter's legal malpractice claim was sufficiently challenged in Sheetz's brief,[3] and there is no evidence of damages resulting from any alleged legal malpractice. *See* TEX. R. APP. P. 38.9; *Elizondo*, 415 S.W.3d at 263; *Bundren*, 347 S.W.3d at 429–30.

---

[3] Following Sheetz's assertion that there were no findings or conclusions relative to legal malpractice, he broadly attacks any possible basis for causation or damages: "she suffered foreclosure because she did not pay her mortgage and for no other reason."

We reverse the trial court's judgment and render judgment that Slaughter take nothing on her claims against Sheetz.


/David L. Bridges/
DAVID L. BRIDGES
JUSTICE


Lang-Miers, J., dissenting.

140982F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

WILLIAM D. SHEETZ, Appellant

No. 05-14-00982-CV     V.

YOLANDA SLAUGHTER, Appellee

On Appeal from the County Court at Law No. 1, Dallas County, Texas
Trial Court Cause No. 08-10401-A.
Opinion delivered by Justice Bridges.
Justices Lang-Miers and Schenck participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and judgment is **RENDERED** that:
Yolanda Slaughter take nothing on her claims against William D. Sheetz.

It is **ORDERED** that appellant WILLIAM D. SHEETZ recover his costs of this appeal from appellee YOLANDA SLAUGHTER.

Judgment entered this 31st day of August, 2016.