**AFFIRM; and Opinion Filed July 18, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-09-01068-CV

### DONALD CARDWELL AND 121 INVESTMENTS, L.L.C., Appellants
### V.
### BILL GURLEY, Appellee

**On Appeal from the 134th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 06-03299**

## MEMORANDUM OPINION

Before Justices Bridges, Brown, and Boatright
Opinion by Justice Brown

Donald Cardwell appeals from a final judgment against him following a bench trial. In six

issues, Cardwell contends the evidence is factually insufficient to support the trial court's findings

of fact and conclusions of law on appellee Bill Gurley's breach of fiduciary duty claim against

Cardwell and the trial court erred in awarding damages by disregarding Cardwell's expert evidence

and allowing Gurley to testify as an expert. For the following reasons, we affirm the trial court's

judgment.

BACKGROUND

Cardwell and Gurley met in the mid-to-late 1980s when Cardwell's construction company

worked on an oil change shop owned by Gurley and a business partner. Cardwell did a good job,

and the partners subsequently hired Cardwell to build five or six additional shops. During the mid-

1990s, the partners also loaned Cardwell money, which he repaid as agreed. Both men had other ongoing business interests: Gurley owned and operated a used car lot and held "small" real estate investments, and Cardwell ran his construction company and was involved in a number of other single entity businesses.

Around 2000, Gurley, Cardwell, and two other investors formed CR78, a corporation to develop a residential subdivision on property near Prosper, Texas that Gurley owned. The shareholders each held a twenty-five percent interest in CR78, and Cardwell served as president. CR78 obtained $1.9 million in financing. Cardwell and Gurley guaranteed the loan, Gurley doing so based on his confidence in Cardwell's abilities. Cardwell managed the development, overseeing construction, handling finances, and ultimately selling all of the residential tracts by the mid-2000s.

During 2000 and early 2001, Gurley officed in a temporary building on commercial property (the Broadway Property) he owned in Prosper. Cardwell visited Gurley at the office from time to time to discuss CR78. Cardwell wanted an office in Prosper and, according to Gurley, asked to purchase half of the Broadway Property so they could construct a building and have a "nice little investment." In 2001, the men formed 121 Investments, LLC (121 Investments), a two-member limited liability company, to purchase the Broadway Property and construct an office building. They executed Articles of Organization and Regulations, and each owned a fifty-percent interest. Cardwell served as managing member, and, according to the Regulations, had "exclusive control and management of the Company and . . . all of the rights and powers to do all things and perform all acts necessary and appropriate for the purposes outlined in the Articles and . . . Regulations."[1] Cardwell understood, as managing member, he was to take care of the Broadway

---

[1] The Regulations specifically authorized Cardwell to acquire, own and maintain the Broadway Property, obtain financing, perform on behalf of the company all of the company's rights, duties and responsibilities as owner, sell or otherwise dispose of the property or any portion thereof, and negotiate, execute and deliver all related documents.

Property and all its business and dispose of it once the parties agreed to sell it. As in CR78, he was looking after both his and Gurley's interests in 121 Investments.

121 Investments obtained financing for the building project, and both Cardwell and Gurley signed the note. Cardwell managed the building's construction, handled all the finances, and was in charge of all of 121 Investments' routine daily matters. When the building was complete, Cardwell leased part of the space for his office and a realty office leased the balance of the building. Both paid rent, and the building generated a positive cash flow.

In late July 2005, the City of Prosper approached Cardwell about acquiring the Broadway Property for its administrative offices. The City proposed paying cash and exchanging another tract of land (Tract 4), which the City owned in the Hickory Creek residential subdivision, for the Broadway Property. At the time, the City's administrative offices were in another building Gurley owned; thus, if 121 Investments sold the Broadway Property, Gurley would lose his rental income from both the City and the Broadway Property tenants. He also would have to spend $15,000 to $20,000 in renovations to attract a new tenant to the building the City was leasing at the time. Gurley was retired and the rental income he received was important to him, so he was not interested in the deal. Cardwell, however, wanted to do the deal and, according to Gurley, needed the money.

Cardwell told Gurley if they acquired Tract 4, they could buy an adjacent tract (the Montgomery Tract), which was already for sale, and build a retail development in the future. Both tracts fronted Preston Road, which was a main thoroughfare. They also discussed acquiring other properties, including another adjacent frontage tract also for sale and already zoned commercial. Cardwell reminded Gurley of the success of the CR78 development, said he would develop this new property, and "laid out how good of a [retail] development could be made . . . at some point." Based on CR78, Gurley was confident that Cardwell could be successful again. They discussed acquiring money for the project, and Gurley subsequently brought bankers by Cardwell's office to

–3–

discuss the project. After talking with the bankers, Gurley and Cardwell agreed to go forward with the project. Cardwell's assurances that he could pull the project together and manage it was important to Gurley because he was retired and had no experience running big real estate projects.

Cardwell, on the other hand, denied suggesting a plan to acquire additional tracts for a commercial development project. Instead, he said he told Gurley he wanted to sell Tract 4 and get a total of $380,000 in cash from the deal. Gurley may have asked Cardwell's opinion about acquiring additional properties, but Cardwell never expressed an interest in doing so. Gurley brought a banker by Cardwell's office, but Cardwell considered it more of an introduction and conveyed to Gurley he was not interested in pursuing other business opportunities with Gurley. Cardwell also testified Gurley said he would "take $380,000" for the deal.

On September 16, 2005, Cardwell and Gurley entered into a Unanimous Consent approving 121 Investment's exchange of the Broadway Property for cash and Tract 4. The same day, Cardwell and the mayor of Prosper, Charles Niswanger, signed an Exchange Settlement Statement. 121 Investments received $190,000 and the deed to Tract 4. Thereafter, the City moved into the Broadway Property building, and Gurley began to renovate his other building for a new tenant.

Gurley testified Cardwell's attitude changed after Cardwell talked Gurley into selling the Broadway Property and the sale was consummated. In early December, Cardwell said he had someone else to loan them money for the Montgomery Tract. Gurley was not interested in adding another partner, and they did not communicate again until late December or early January when Gurley inquired about his share of Tract 4 property taxes. Cardwell said he was "working on it." Gurley later learned Cardwell had already sold Tract 4.

Indeed, on December 21, 2005, Cardwell had entered into an Earnest Money Contract to sell Tract 4 to Hickory Creek at Preston, LCC (Hickory Creek LLC) for $225,000. Cardwell sold

–4–

Tract 4 without obtaining an appraisal or listing or otherwise advertising the property for sale. Cardwell testified he told Gurley there were potential buyers at some point during the three months 121 Investments owned Tract 4. When the buyer was ready to close, Cardwell said he left a voicemail telling Gurley he was selling Tract 4 for $225,000 and to call back with any questions. Cardwell never heard back from Gurley and saw no need to follow up because the $225,000 sales price made the overall deal for the Broadway Property more profitable than the amount they had agreed to accept. Cardwell did not hear from Gurley until January 2006; Gurley was upset and wanted to know why Cardwell had sold Tract 4.

Gurley testified he never received a voicemail from Cardwell and only learned of the sale when a title agent informed Gurley he could pick up his share of the sale proceeds. Cardwell also had not told Gurley that, approximately two and a half weeks before they signed the Unanimous Consent, Hickory Creek, LLC had arranged to purchase the Montgomery Tract. Nor had Cardwell divulged that he facilitated that sale of the Montgomery Tract. Earlier that summer, Niswanger told Cardwell that Niswanger planned to purchase the Montgomery Tract and wanted to partner or assign the sales contract. Cardwell connected Niswanger to a friend, Donald Lookadoo, who was looking for property fronting Preston Road. Cardwell knew Gurley also was looking for good buys in the Prosper area, but did not share the Montgomery Tract opportunity because "he did not know Gurley had an interest in it."

On August 29, 2005, Niswanger entered into an earnest money contract to purchase the Montgomery Tract. Niswanger assigned his interest in the contract to Hickory Creek LLC. Hickory Creek LLC, an entity formed to purchase the Montgomery Tract, was owned by Dallas Jamestown; Lookadoo was an investor in Dallas Jamestown. On September 28, 2005, Hickory Creek LLC closed on the property, paying $225,000, the same price it subsequently paid for Tract

4. Hickory Creek LLC purchased the tracts as a long-term investment, hoping for the eventual widening of Preston Road and zoning changes.

Cardwell admitted he had already helped arrange the Montgomery Tract assignment to Hickory Creek LLC when he spoke with Gurley and the banker. But, according to Cardwell, Gurley did not express any interest in the Montgomery Tract until it was already under contract. Cardwell also testified he told Gurley the Montgomery Tract was already committed to someone else with whom Cardwell had done business. Gurley, however, denied that Cardwell ever disclosed the arrangement to sell or the sale of the Montgomery Tract. If he had known Cardwell was arranging its sale to someone else, Gurley would never have agreed to sell the Broadway Property.

Cardwell denied being in cahoots with anyone related to Hickory Creek, LLC in any way to defraud or cheat 121 Investments or Gurley. He looked to Hickory Creek LLC as a potential buyer for Tract 4 based on its purchase of the Montgomery Tract. He had known both Lookadoo and Jim Howard, another Dallas Jamestown investor, for some time. Howard and Lookadoo had invested in a number of Cardwell's "deals" over approximately ten years.[2] Howard also was Cardwell's CPA on a few projects. And, when Cardwell advised Lookadoo of the Montgomery Tract opportunity, Cardwell was constructing a building for Lookadoo and another partner near Little Elm.

Lookadoo testified the sale of Tract 4 was arms-length despite Lookadoo's previous dealings with Cardwell. Neither Cardwell nor his construction business had any interest in Dallas Jamestown, Hickory Creek LLC, or any other business entity to which Lookadoo or Howard were parties at the time of the transaction. Howard testified that he had no business relationship with

---

[2] At trial, Cardwell testified Lookadoo and Howard had invested in six to ten deals, but he testified the number was ten to fifteen deals during his deposition.

Cardwell at the time of the purchase of the two tracts although he subsequently invested in real estate deals with Cardwell. Cardwell similarly testified that he had no interest in Hickory Creek LLC or retained any interest in Tract 4 or the Montgomery Tract. During depositions, however, both Cardwell and Howard testified Cardwell had been paid a fee for his role in the Montgomery Tract transaction.[3] At trial, both men testified they had been mistaken.[4] Instead, Hickory Creek LLC had reimbursed Cardwell's construction company $12,500 for installing hardwood floors in Niswanger's son's house as compensation to Niswanger for the Montgomery Tract assignment. Cardwell made no profit as a result of the flooring work. Neither man had an explanation for how they could have both made the same mistake during the earlier depositions.

Gurley, individually and derivatively on behalf of 121 Investments, sued Cardwell and Hickory Creek LLC, asserting, among other things, a cause of action for breach of fiduciary duty against Cardwell. The parties tried the case to the bench, and the trial court entered a final judgment in favor of Gurley, awarding $318,478.25 as actual damages. The trial court also entered findings of fact and conclusions of law. Cardwell filed a timely notice of appeal in 2009, but filed a voluntary petition for Chapter 7 bankruptcy relief shortly thereafter. We abated this appeal until the bankruptcy case was closed in 2015. We abated the appeal a second time after the bankruptcy court reopened its case in 2016 and reinstated the appeal after the bankruptcy court lifted its stay in 2017.

BREACH OF FIDUCIARY DUTY

In his first four issues, Cardwell challenges the factual sufficiency of the evidence supporting the trial court's determinations on the elements of Gurley's breach of fiduciary duty

---

[3] Howard testified that Cardwell was paid a $12,500 fee for bringing the Montgomery Tract deal to Hickory Creek LLC. Cardwell testified Hickory Creek LLC paid him $10,000 for putting the deal together.

[4] Cardwell testified he realized his mistake looking though files later, contacted his counsel, and testified about the mistake in an additional deposition as well as at trial.

claims. Specifically, Cardwell contends the trial court erred in concluding (1) Cardwell owed Gurley a fiduciary duty either as managing member of 121 Investments or informally, (2) Cardwell breached that duty, and (3) Cardwell was monetarily liable to Gurley for any breach.

*Applicable Law*

A trial court's findings of fact in a bench trial carry the same weight as a jury's verdict, and we review the evidence supporting them under the same standards for determining if sufficient evidence supports a jury answer. *Catalina v. Blasdel*, 881 S.W.3d 295, 297 (Tex. 1994); *Sheetz v. Slaughter*, 503 S.W.3d 495, 502 (Tex. App.—Dallas 2016, no pet.). Findings of fact supported by the evidence are binding if the appellate record contains a reporter's record. *Sheetz*, 503 S.W.3d at 502. For a factual-sufficiency challenge, we consider and weigh all the evidence in a neutral light and set aside the finding only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Morris v. Wells Fargo Bank, NA*, 334 S.W.3d 838, 842 (Tex. App.—Dallas 2011, no pet.). In a bench trial, the trial court, as factfinder, is the sole judge of witness credibility and the weight to be given testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *Sheetz*, 503 S.W.3d at 502. We may not substitute our judgment for that of the factfinder if the evidence falls "within the zone of reasonable disagreement." *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005); *Sheetz*, 503 S.W.3d at 502.

We review the trial court's conclusions of law de novo and will affirm if the trial court correctly drew the legal conclusion from the facts. *See BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *Sheetz*, 503 S.W.3d at 502. We will reverse the trial court's judgment only if the conclusions of law are erroneous as a matter of law. *Sharifi v. Steen Auto, L.L.C.*, 370 S.W.3d 126, 149 (Tex. App.—Dallas 2012, no pet.). We must uphold conclusions of law if "any legal theory supported by the evidence sustains the judgment." *Id*. (quoting *Bundren*

–8–

*v. Holly Oaks Townhomes Ass'n, Inc.*, 347 S.W.3d 421, 430 (Tex. App.—Dallas 2011, pet. denied)).

To prevail on a claim for breach of fiduciary duty, a plaintiff must establish (1) a fiduciary relationship existed between the plaintiff and defendant, (2) the defendant breached his fiduciary duty to the plaintiff, and (3) the defendant's breach resulted in injury to the plaintiff or benefit to the defendant. *Anderton v. Cawley*, 378 S.W.3d 38, 51 (Tex. App.—Dallas 2012, no pet.). Two types of relationships give rise to fiduciary duties: formal and informal. *Meyer v. Cathey*, 167 S.W.3d 327, 330-31 (Tex. 2005). Fiduciary duties are owed as a matter of law in formal relationships, which include relationships between partners, principals and agents, and attorneys and clients. *Meyer*, 167 S.W.3d at 330; *McAfee, Inc. v. Agilysis, Inc.*, 316 S.W.3d 820, 829 (Tex. App.—Dallas 2010, no pet.). An informal relationship also may give rise to a fiduciary duty when one person trusts and relies on another, whether the relationship is moral, social, domestic, or purely personal. *Crim Truck & Tractor Co. v. Navistar Int'l Tranp. Corp.*, 823 S.W.2d 591, 593-94 (Tex. 1992), *superseded by statute on other grounds as noted in Subaru of Am., Inc., v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225-26 (Tex. 2002). "A person is justified in believing another to be his fiduciary 'only where he or she is accustomed to being guided by the judgment and advice of the other party, and there exists a long association in a business relationship, as well as a personal friendship.'" *McAfee, Inc.*, 316 S.W.3d at 829 (quoting *Pabich v. Kellar*, 71 S.W.3d 500, 505 (Tex. App.—Fort Worth 2002, pet. denied)); *see also Willis v. Donnelly*, 199 S.W.3d 262, 277 (Tex. 2006) ("[T]o impose such a relationship in a business transaction, the relationship must exist prior to, and apart from, the agreement made the basis of the suit."). The existence of an informal fiduciary relationship is usually a question of fact. *Crim Truck & Tractor Co.*, 823 S.W.2d at 594; *Siddiqui v. Fancy Bites, LLC*, 504 S.W.3d 349, 367 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

Neither the Texas Limited Liability Company Act (TLLCA), which applies to 121 Investments in this case, nor the subsequently-enacted limited liability company provisions of the Texas Business Organizations Code (TBOC) directly address the duties owed by managers and/or members of limited liability companies. Both, however, presume the existence of fiduciary duties, providing that a limited liability company may "expand or restrict" any duties (including fiduciary duties) of a member, manager, officer, or other person. *See* Act of May 28, 1997, 75th Leg., R.S, ch. 375, S.B. 555, § 58, sec. 2.20(b), 1997 Gen. Laws 1516, 1565 (expired Jan. 1, 2010) (current version at TEX. BUS. ORGS. CODE ANN § 101.401 (West 2012)).[5]

*Duty*

In his first two issues, Cardwell contends the trial court erred in determining he owed Gurley a fiduciary duty either as the managing member of 121 Investments or informally. Cardwell maintains that, because 121 Investments was a two-member LLC and its Articles of Organization provided that it would not have managers, neither Cardwell nor Gurley owed the other a fiduciary duty. Cardwell also asserts he owed no informal fiduciary duty to Gurley because they were simply businessmen interacting as equals. Although Cardwell acknowledges the trial court concluded Cardwell, as managing member, also owed fiduciary duties to 121 Investments, he has not raised an issue challenging that conclusion.

An appellant must challenge each independent ground that fully supports a complained-of ruling or judgment. *Oliphant Fin. LLC v. Angiano*, 295 S.W.3d 422, 423-24 (Tex. App.—Dallas 2009, no pet.); *Reynolds v. Guido*, 166 S.W.3d 789, 795 (Tex. App.—Dallas 2005, pet. denied).

---

[5] In full, section 2.20(b) of the TLLCA provides:

> To the extent that at law or in equity, a member, manager, officer, or other person has duties (including fiduciary duties) and liabilities relating thereto to a limited liability company or to another member or manager, such duties and liabilities may be expanded or restricted by provisions in the regulations.

Act of May 28, 1997, 75th Leg., R.S, ch. 375, S.B. 555, § 58, sec. 2.20(b), 1997 Gen. Laws 1516, 1565 (expired Jan. 1, 2010) (current version at BUS. ORGS. § 101.401 (West 2012)).

If an appellant fails to assign error to an independent ground that fully supports the complained-of ruling or judgment, we must accept the validity of that ground, rendering harmless any error in the ground challenged on appeal. *Oliphant Fin. LLC*, 295 S.W.3d at 423-24. Thus, we must overrule a challenge to fact findings that underpin a legal conclusion or disposition when other fact findings that also support that legal conclusion or disposition are not challenged. *Howeth Inv., Inc. v. City of Hedwig Village*, 259 S.W.3d 877, 889 (Tex. App.—Houston [1st Dist.] 2008, pet. denied); *see also Long v. Long*, 196 S.W.3d 460, 468-69 (Tex. App.—Dallas 2006, no pet.). The same is true if an appellant challenges only one legal conclusion on appeal, but more than one legal conclusion independently supports a judgment or ruling. *Howeth Inv., Inc.*, 259 S.W.3d at 889. *See also Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993) ("We have held repeatedly that the courts of appeals may not reverse the judgment of a trial court for a reason not raised in a point of error.").

Generally, an appellant must direct an attack on the sufficiency of the evidence at specific findings of fact and conclusions of law rather than at the judgment as a whole. *Shaw v. County of Dallas*, 251 S.W.3d 165, 169 (Tex. App.—Dallas 2008, pet. denied). Unchallenged findings are binding on an appellate court, but we may review specific findings being challenged if we are able to fairly determine them. *Shaw*, 251 S.W.3d at 169; *In re M.S.F.*, 383 S.W.3d 712, 716 (Tex. App.—Amarillo 2012, no pet.).

Here, a number of the trial court's findings and conclusions related to Cardwell's fiduciary duty to 121 Investments and Gurley, including Conclusion of Law 2:

> Cardwell, as the managing member of 121 Investments, owed the LLC fiduciary duties of loyalty and due care as a matter of law. Since Gurley was the only other member of the LLC, such fiduciary duties accrued, and were therefore also owed, directly to Gurley by Cardwell as a matter of law.

The legislature has enacted special provisions allowing shareholders of closely-held corporations and limited liability companies to more easily bring a derivative suit on behalf of the company. The current provision relating to limited liability companies gives a trial court discretion to treat

–11–

"a derivative proceeding brought by a member of a closely held limited liability company . . . as a direct action brought by the member for the member's own benefit" and to order "a recovery in a direct or derivative proceeding by a member [to be] paid directly to the plaintiff or to the limited liability company if necessary to protect the interests of creditors or other members of the limited liability company." BUS. ORGS. § 101.463(c) (West 2012). A closely-held limited liability company is defined as a company with less than thirty-five shareholders and "no shares listed on a national securities exchange or regularly quoted in an over-the-counter market by one or more members of a national securities association." *Id*. at § 101.463(a). Article 5.14(L)(1) of the now-superseded Texas Business Corporations Act (TBCA), and its successor in the TBOC, include the same provision for closely-held corporations. *See* Act of May 28, 1997, 75th Leg., R.S, ch. 375, S.B. 555, § 30, sec. 5.14, 1997 Gen. Laws 1516, 1543 (expired Jan. 1, 2010) (current version at BUS. ORGS. § 21.563(c) (West 2012)). And, at all times relevant to this case, article 8.12 of the TLLCA provided that TBCA article 5.14 also applied to limited liability companies and their members, managers, and officers. *See* Act of June 20, 2003, 78th Leg., R.S. ch. 572, § 10, sec. 8.12(a), 2003 Tex. Gen. Laws 1934, 1939 (expired Jan. 1, 2010).

Gurley properly brought his claims individually and derivatively on behalf of 121 Investments, which falls within the definition of a closely-held limited liability company. Both the final judgment and the findings of fact and conclusions of law reflect the trial court's determination that Gurley was entitled to a direct recovery on both his individual claim and his derivative claim on behalf of 121 Investments for "damages incurred by himself and by 121 Investments as a result of Cardwell's breaches of fiduciary duties." And, Cardwell admits he owed a fiduciary duty to 121 Investments. Because the trial court's findings of fact and conclusions of law regarding Caldwell's fiduciary duty to 121 Investments is sufficient to independently support the trial court's judgment, we need not address whether there is factually sufficient evidence to

support the trial court's findings and conclusions regarding Caldwell's fiduciary duty to Gurley individually. Accordingly, we overrule Cardwell's first and second issues.

*Breach*

In his third issue, Cardwell contends the trial court erred in finding he breached a fiduciary duty. As support, he directs us to 121 Investments' Regulations, which he asserts authorized all of his actions as managing member, and the fact that both Cardwell and Gurley maintained ongoing business interests, including purchasing and selling real estate, outside of 121 Investments. Cardwell does not complain of specific findings or conclusions, but we assume he intends to challenge the following findings of fact and conclusion of law:[6]

> 16. Cardwell's sale of Tract 4 was (i) not in the ordinary course of 121's business, (ii) which made it impossible for 121 to carry out its ordinary business, (iii) was an act of dissolution of 121 Investments, (iv) was not approved by a majority in ownership of the members of 121 Investments, and (v) was a breach of Cardwell's fiduciary duties to both 121 Investments and Gurley.

> 17. Cardwell was also guilty of numerous other breaches of his fiduciary duties to both 121 Investments and Gurley.

> 4. Cardwell breached all of his fiduciary duties to 121 Investments and to Gurley.

---

[6] A number of other findings of fact more specifically describe the acts by Cardwell giving rise to breach:

> 7. Many of Cardwell's statements and promises which induced Gurley to agree to the exchange were (i) materially false and misleading, and (ii) failed to disclose material facts, which if known to Gurley, would have caused him to refuse to agree to the exchange.. . .

> 9. Also in September, 2005, Cardwell, without Gurley's knowledge or consent, arranged for Hickory Creek LLC to purchase [the Montgomery Tract] for $225,000 from the then owners. Cardwell had represented to Gurley that 121 Investments would acquire [the Montgomery Tract] as part of its development, yet he made no effort to obtain the property for 121 Investments, and instead concealed from Gurley that (i) [the Montgomery Tract] had been sold, (ii) in a transaction which Cardwell had arranged, (iii) to Hickory Creek LLC which was owned by Cardwell's business associates, (iv) for an inadequate price, and (v) that Cardwell had personally benefitted from the transaction in the form of a bribe and through enhanced business relations with Hickory Creek's principals.

> 10. Cardwell, purporting to act on behalf of 121 Investments, sold Tract 4 to Hickory Creek LLC in late December, 2005 for $225,000. He concealed the sale from Gurley until after (i) it had closed, (ii) the proceeds had been deposited in the title company, and (iii) Cardwell had taken half of the money for himself. Cardwell never voluntarily disclosed the details about the sale to Gurley, and Gurley never consented to, or ratified, the sale once he learned about the sale after it had closed.

> 11. In selling Tract 4, Cardwell (i) never had it appraised, (ii) never advertised it for sale, (iii) never listed it for sale with any real estate broker, (iv) did not bargain with Hickory Creek LLC on the price, and (v) made no effort to ascertain its value to 121 Investments as a development opportunity.

Here, the evidence shows that Cardwell knew that Hickory Creek LLC investors were looking for properties fronting Preston Road and helped arrange for their purchase of the Montgomery Tract during the summer 2005. There was also some evidence that Cardwell received a fee for his services facilitating that transaction.

The evidence further shows Cardwell wanted to sell the Broadway Property and obtain cash. Gurley, the only other member of 121 Investments, did not. Knowing the Montgomery Tract was already subject to an earnest money contract and assignment that he helped arrange, Cardwell convinced Gurley to go through with the sale in order to pursue a future commercial development on Tract 4, the Montgomery Tract, and possibly other nearby tracts. Cardwell did so over the course of multiple discussions, including discussions with bankers about financing the development. Yet, Cardwell had no intention of obtaining any additional properties for a development. His only intent was to sell Tract 4, resulting in the dissolution of 121 Investments, and he knew he had a potential buyer in Hickory Creek LLC. Cardwell sold Tract 4 without obtaining an appraisal or advertising the property and never discussed the sale with Gurley, who only learned of it afterwards from a title agent. At the time of transaction, Cardwell was working on a construction project for Lookadoo. Following the transaction, Howard invested in a number of Cardwell's real estate deals.

To be sure, Cardwell testified at trial that he received no fee and did nothing to convince Gurley, the only other member in 121 Investments, to sell the Broadway Property. But, the trial court is the sole judge of the witnesses' credibility. *See McGalliard*, 722 S.W.2d at 696. As such, it was free to believe the evidence showing Cardwell's acts vis-à-vis 121 Investments and Gurley, its only other member, were dishonest and self-interested and disbelieve Cardwell's testimony. Indeed, the findings of fact and conclusions of law make clear that is exactly what happened, and

–14–

we may not substitute our judgment for that of the trial court. *See City of Keller*, 168 S.W.3d at 822; *Sheetz*, 503 S.W.3d at 502.

Although the Regulations gave Cardwell broad authority as manager member, as a fiduciary he owed 121 Investments a strict duty of good faith and candor and was prohibited from using the relationship to benefit his personal interests without the principal's full knowledge and consent. *See, e.g., Lowry v. Tarbox*, 537 S.W.3d 599, 615 (Tex. App.—San Antonio 2017, pet. denied); *Loy v. Harter*, 128 S.W.3d 397, (Tex. App.—Texarkana 2004, pet. denied) (citing *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 577 (Tex. 1963) (duty of loyalty requires "extreme measure of candor, unselfishness, and good faith[,]" and, as fiduciaries, corporate directors are "under obligation not to usurp corporate opportunities for personal gain," and must dedicate "uncorrupted business judgment for the sole benefit of the corporation")). Considering and weighing all of the evidence in a neutral light, we conclude the trial court's finding that Cardwell breached his fiduciary duty of loyalty to 121 Investments is not so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. Accordingly, we overrule Cardwell's third issue.

*Liability*

In his fourth issue, Cardwell contends the trial court erred in "finding causation and damages via monetary liability" because the parties contractually eliminated liability in 121 Investment's Articles of Organization. Again, Cardwell does not complain of specific findings or conclusions, and we have found none that specifically address the parties' contractual elimination of liability.

As with duties, a limited liability company also may expand or restrict a member's or manager's liability to the company or to another member or manager. Act of May 28, 1997, 75th Leg., R.S, ch. 375, S.B. 555, § 58, sec. 2.20(b), 1997 Gen. Laws 1516, 1565 (expired Jan. 1, 2010)

(current version at BUS. ORGS. § 101.401). And, 121 Investments' Articles of Incorporation provide for limited liability:

> [N]o member of the Company shall be liable, personally or otherwise, in any way to the Company, its creditors or its members for monetary damages caused in any way by an act or omission occurring in the member's capacity as a member of the Company, except as otherwise expressly provided by Article 1302-7 06 B, as amended or the Regulations of the Company.

Although repealed in 2010, Article 1302-7.06(B) was effective at all times relevant to this litigation, providing:

> The articles of incorporation of a corporation may provide that a director of the corporation shall not be liable, or shall be liable only to the extent provided in the articles of incorporation, to the corporation or its shareholders or members for the monetary damages for an act or omission in the director's capacity as a director, except that this article does not authorize the elimination or limitation of the liability of a director to the extent the director is found liable for:
>
> (1) a breach of the director's duty of loyalty to the corporation or its shareholders or members;
>
> (2) an act or omission not in good faith that constitutes a breach of duty of the director to the corporation or an act or omission that involves intentional misconduct or a knowing violation of the law;
>
> (3) a transaction from which the director received an improper benefit, whether or not the benefit resulted from an action taken within the scope of the director's office; or
>
> (4) an act or omission for which the liability of a director is expressly provided by an applicable statute.

Act of June 14, 1989, 71st Leg., R.S., ch. 625, § 1, art. 1302-7.06(B), 1989 Tex. Gen. Laws 2093, 2094 (expired Jan. 1, 2010) (current version at BUS. ORGS. § 7.001(c) (West Supp. 2017)). By incorporating the terms of article 1302-7.06(b), the parties did not contract for "zero liability" as Cardwell asserts. Liability for a breach of the fiduciary duty of loyalty is excepted from the provision's elimination or limitation of liability. Because the evidence supports the trial court's finding that Cardwell breached his fiduciary duty of loyalty to 121 Investments, we overrule Cardwell's fourth issue.

–16–

In his fifth issue, Cardwell contends the trial court also erred in failing to apply the business judgment rule to protect Cardwell from liability for his actions. The business judgment rule may protect corporate officers and directors owing fiduciary duties to a corporation from liability for alleged breach of duties based on negligent, unwise, or imprudent acts if the acts were "within the exercise of their discretion and judgment in the development or prosecution of the enterprise in which their interests are involved." *Sneed v. Webre*, 465 S.W.3d 169, 178 (Tex. 2015). The rule does not protect a corporate officer or director from liability for dishonest, fraudulent, or self-dealing acts. *See Webre v. Sneed*, 358 S.W.3d 322, 336–37 (Tex. App.—Houston [1st Dist.] 2011(business judgment rule does not apply in action for fraud or breach of fiduciary duty brought by shareholder against officer of closely-held corporation), *aff'd*, 465 S.W.3d 169; *see also Pace v. Jordan*, 999 S.W.2d 615, 624 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (business judgment rule does not apply if director/officer decision was "something beyond unsound business judgment"); *Lowry*, 537 S.W.3d at 615-16.

Because Gurley specifically alleged, and the evidence supports, the trial court's findings that Cardwell breached his fiduciary duty to 121 Investments, the trial court's failure to apply the business judgment rule was not error. Accordingly, we overrule Cardwell's fifth issue.

PROPERTY VALUATION

In his sixth issue, Cardwell contends the trial court erred in rejecting the expert testimony of James Archibald as unreliable and unpersuasive. Cardwell relies on Archibald's years of experience as a real estate appraiser with a history of testifying before courts, including the Texas Supreme Court, and notes Gurley did not object to Archibald's report or testimony.

Archibald appraised Tract 4 at $225,000, or $2.14 per square foot, after trying to find other residential tracts on the Multiple Listing Service, discussing the property's zoning with the City, and considering his own knowledge regarding a Texas Department of Transportation project to

widen Preston Road. Archibald included "probably more" than twenty sales, including 121 Investments' sale of Tract 4, as comparables and testified that, "[a]fter looking at the subject property, quite simply, I've got a tract of land that sold for $2.70 a foot."[7] Thus, Archibald valued the property, as of the date it sold, for the amount at which it sold.

Gurley also testified to the value of Tract 4, concluding it was worth $5 per square foot. Gurley based his opinion on the amounts he paid for two other tracts he purchased in the Hickory Creek subdivision around the date Cardwell sold Tract 4. Specifically, he purchased Number 1 Pasework at the rear of the subdivision in October 2005 for $2.55 per square foot and Number 6 Pasework in early 2006 for $3.97 per square foot. Neither of those tracts fronted Preston Road. Gurley also had paid $4.90 per square foot for four acres fronting Preston Road six miles north of the Hickory Creek subdivision. In forming his opinion, Gurley also considered a tract across the street from Tract 4 zoned commercial, solicited on the Multiple Listing Service, and later sold for $10 per square foot and another property three to four hundred yards north on Preston Road that sold for $5.00 per square foot. Considering these comparables, Gurley determined $5.00 per square foot was the fair market value of Tract 4. Archibald testified he had not included the properties Gurley identified as comparables in his report, although Archibald acknowledged that some of them were in the same subdivision.

According to finding of fact 15, Archibald's testimony, including his inability to articulate the reasons he arrived at his damages figure or used Tract 4 as a comparable and his failure to rebut the comparables Gurley identified, was not persuasive to the trial court. Finding of fact 15 further recites that Gurley's testimony "regarding the value of the property, including testimony about the commercial and residential zoning in the area and the examples of comparison properties in the area, was persuasive based on the Court's observation during direct and cross-examination."

---

[7] Archibald testified that his appraisal was $2.70 per square foot, but his expert report reflects an appraisal of $2.14 per square foot.

Archibald may have had considerable experience appraising realty, but that was simply a factor the trial court was free to consider in assessing the weight to give the witnesses' testimony.

Cardwell also asserts, without any substantive argument, the trial court erred in treating Gurley as his own expert on the valuation. But, a property owner generally is qualified to testify to the value of his property even if he does not qualify as an expert. *Natural Gas Pipeline Co of Am. v. Justiss*, 397 S.W.3d 150, 156 (Tex. 2012). The testimony must "meet the same requirements as any other opinion evidence," and an owner "must provide the factual basis on which his opinion rests." *Justiss*, 397 S.W.3d at 156, 159 (internal quotations omitted). We conclude Gurley presented sufficient factual bases for the trial court to consider his valuation opinion. And, considering and weighing all of the evidence on the valuation of Tract 4, we conclude the evidence supporting the trial court's findings in support of the damages award is not so weak or so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176. We overrule Cardwell's sixth issue.

We affirm the trial court's judgment.

/Ada Brown/
ADA BROWN
JUSTICE

091068F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DONALD CARDWELL AND 121
INVESTMENTS, L.L.C., Appellant

No. 05-09-01068-CV    V.

BILL GURLEY, Appellee

On Appeal from the 134th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. 06-03299.
Opinion delivered by Justice Brown;
Justices Bridges and Boatright
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee BILL GURLEY recover his costs of this appeal from appellant DONALD CARDWELL.

Judgment entered this 18th day of July, 2018.