In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-22-00390-CV**
_____

**RONALD A. BAIN, Appellant**

**V.**

**JASON HARDY WINN AND MARY ANN WINN, Appellees**

_____

**On Appeal from the 284th District Court**
**Montgomery County, Texas**
**Trial Cause No. 21-03-03045-CV**

_____

**MEMORANDUM OPINION**

Ronald A. Bain ("Appellant" or "Bain") appeals the trial court's take-nothing judgment in favor of Jason Hardy Winn ("Jason") and Mary Ann Winn ("Mary") (collectively "Defendants" or "Appellees"). In three issues, Bain argues that the trial court erred in finding that no contract existed between Bain and Jason, or Bain and Mary, the trial court erred in calculating statutes of limitations, and erred by excluding Bain's expert witnesses from testifying. We affirm the trial court's judgment.

Procedural Background

On March 5, 2021, Bain filed his pro se lawsuit against the Defendants "Jason Hardy Winn and Mary Ann Winn dba Winn Automotive[,]"[1] alleging he paid $17,500 for the restoration of his 1970 Chevelle SS454 (hereinafter "'70 Chevelle" or "car") that was never completed, the car was flooded while in the Defendants' control, and the Defendants refused to return his car. Wayne Winn ("Wayne") operated Winn's Automative, and Wayne died in 2013. Mary (Wayne's wife) and Jason (Wayne's son) filed their answers. According to Bain's amended petition, he and the Defendants entered into an agreement in January 2011 in which Bain hired Winn's Automotive to restore his '70 Chevelle, and the Defendants picked the car up that month. The amended petition alleged that the Defendants ignored Bain's inquiries into the status of the restoration over the next twenty-three months and that in March 2015 through January 2016 Jason either did not respond to Bain's inquiries or provided falsehoods or broken promises regarding the status of the restoration. Bain alleged that Mary refused to talk to Bain on the telephone and that Mary and Jason refused to allow Bain's requests to inspect the car or to provide photos of the

---

[1] In his amended petition, Bain identified the Defendants as "Mary Ann Winn, individually, and dba Winn's Automotive" and "Jason Hardy Winn." As explained herein, Bain does not challenge the trial court's conclusion in its Findings of Fact and Conclusions of Law that Winn's Automotive was nothing more than an assumed name and that it was not an entity. Accordingly, the trial court's Final Judgment identifies the Defendants in the lawsuit as "Jason Hardy Winn" and "Mary Ann Winn[.]"

vehicle and odometer for insurance purposes. According to the amended petition, Bain spent $17,500 for the restoration and sent a demand letter to the Defendants in April of 2018 for the return of the car, which they ignored. Bain alleged that when the car was removed from Defendants' property through a court order in March of 2019, he discovered that the vehicle had been flooded while in the Defendants' possession which caused "catastrophic damage" to the car and prompted him to file suit. Bain asserted he spent $19,800 on the car's restoration since March 2019 and expected to spend more than $70,000 to restore the car. Bain sued the Defendants for breach of contract, negligence, promissory estoppel, fraud, conversion, and under the Texas Theft Liability Act. Bain sought actual, punitive, and exemplary damages as well as attorney's fees, costs, and pre- and post-judgment interest.

In the Defendants' First Amended Answer, Jason and Mary asserted a general denial, verified denials, and affirmative defenses. In their verified denials, Jason and Mary asserted the following: they are improper parties; the "[p]roper party has been deceased for several years[;]" they are not in a partnership with the deceased; Bain failed to bring a claim in probate against the estate of the deceased; no account exists between Jason and Mary and Bain nor did Bain contract or pay consideration to them for the issue upon which Bain sues; and that Mary and Jason were not doing business as "Winn Automotive" during the relative times and places when the causes of action, if any, accrued between Bain and the deceased. Jason and Mary asserted the

3

affirmative defenses of failure to mitigate damages, statute of frauds, statute of limitations, laches, failure of consideration, estoppel, abandonment, consent, contributory negligence, and offset.

After a bench trial, the trial court in a Final Judgment entered a take-nothing judgment against Bain in favor of Jason and Mary, ordered Bain to pay attorney's fees and court costs, and awarded Jason and Mary post-judgment interest. Upon Bain's request, the trial court entered its Findings of Fact and Conclusions of Law. Bain timely appealed.

Evidence at Trial[2]

Testimony of Ronald Bain

Ronald Bain testified that he owns several specialty cars. According to Bain, in the past he had hired Winn's Automotive to work on his wife's 2002 Corvette and his 1966 Chevelle Super Sport 396 ("'66 Chevelle"). He recalled that he was satisfied with the work Winn's Automotive performed on his wife's car, and during the late stages of Winn's Automotive's work on the '66 Chevelle, Bain was again impressed with the business's work and decided to have Winn's Automotive "freshen[] up" the '70 Chevelle". Bain testified that he had purchased the '70 Chevelle for his son in his son's senior year of high school for $11,500 and that the

---

[2] We limit our discussion of the evidence at trial to what is necessary for the determination of the appellate issues presently before this Court.

car has "significant intrinsic value[.]" According to Bain, after his son went off to college, Bain had owned the car for more than ten years, and although it was mechanically sound, he wanted Winn's Automotive to give the car a new paint job and to do interior work to restore it.

Bain recalled that in 2010, Wayne Winn, and Wayne's son, Jason, came to Bain's house and picked up the car and trailered it to Winn's Automotive to begin working on it once the work on Bain's '66 Chevelle was completed. Bain testified that his agreement with Wayne for the work on the '70 Chevelle was not in writing. Photographs of Wayne and Jason picking up the car and the car's condition on that day were admitted into evidence. At trial, Bain described the car's condition on the day that it was picked up as in excellent condition, mechanically sound, "in perfect working order[,]" but in need of a "new paint job, new interior, [and] new dash pad." Bain testified that there was a verbal agreement that the work would take six to nine months from the time the work on the car began. According to Bain, he paid Winn's Automotive a $1,000 down payment that was not associated with any work or work to be done on the car, and that there would be payments made later.

A Quicken ledger with a list of Bain's checks given to Winn's Automotive for the work on Bain's cars was admitted into evidence. Bain testified that about seven months after the '70 Chevelle arrived at Winn's Automotive, the work on it began

5

"which is not unusual[]" because it is "pretty typical[]" for vehicles to be "queue[d] up" in the shop and ready to be worked on when a shop is ready to start on it.

Bain testified that after Wayne died, he gave condolences to Wayne's family because he "knew Wayne pretty well" and had an agreement with Jason that because of Wayne's passing and that he was a large part of the shop personnel, that Bain "wouldn't press for the ['70 Chevelle] to be finished within the original time limit." Bain testified that after Wayne's death, Bain did not enter into a written contract with Jason to perform additional work on the '70 Chevelle. According to Bain, after Wayne passed away on May 10, 2013, Bain had a discussion with Jason about who to make the checks payable to for work done by Winn's Automotive, and that Jason would instruct Bain to whom he should make the check payable to for any work. Bain testified he wrote a check to Mary Winn on May 24, 2013, as a final payment on the restoration on the '66 Chevelle, and a check to Jason Winn on May 29, 2013, for additional work on the '66 Chevelle. According to Bain and the ledger of checks admitted into evidence, he wrote checks to Winn's Automotive in November of 2013 totaling $2,615 for work done on Bain's wife's 2002 Corvette. At that point in time, he believed the '70 Chevelle was at Winn's Automotive and that the status of Winn's Automotive's operation as a business was "[a] work in progress."

According to Bain, "for the bulk of 2013, in the months following Wayne Winn's death, the relationship [between Bain and Jason] was ongoing in terms of

6

[Bain's] expectation and [Jason's] commitment to finishing off the project." Bain testified that "95 percent" of his communications regarding the status of the work on the '66 Chevelle and the '70 Chevelle were through Jason and that Jason usually picked up checks Bain wrote for the work done on the vehicles. Bain testified that there was no discussion about payments for the '70 Chevelle because Bain had already paid $17,500 for the work on the car. Bain recalled that he became concerned about the '70 Chevelle around the end of 2013 and communicated with Jason about the car through phone calls and texts. Bain explained at trial that Jason never claimed that he needed to be paid separately or for additional work on the car, but that Bain was waiting for the car to be finished being restored and returned to him. Text messages between Bain and Jason from March of 2015 to October of 2018 were admitted into evidence. Bain testified that he could not retrieve text messages with Jason prior to March 2015 because his cell phone quit working and that data was lost.

Bain testified that in late March of 2015, he texted Jason in a series of texts inquiring about the status of the car and Jason told him that he was working on it; Bain continued to inquire about the car's status in April of 2015 and Jason responded that he was trying to deliver the '66 Chevelle to Bain but it kept raining and that the '70 Chevelle was "looking good[]" which Bain interpreted to mean as the work was almost complete; on May 22, 2015, Jason responded to Bain's inquiries about the

7

car by saying that he was busy getting parts and would call him back; and several times in June of 2015, Jason responded to Bain's inquiries by texting that he would deliver the car soon but did not deliver the '66 Chevelle until July 30, 2015 and still kept the '70 Chevelle despite Bain's inquiries; Bain continued to inquire about the '70 Chevelle and Jason stated in August of 2015 that he was "pretty close to being done" with the work; Jason did not respond to Bain's texts in September or October of 2015; on November 5, 2015, Jason texted apologizing for not responding and stated that he had been busy but would call him later that evening and Bain was led to believe that work was virtually completed on the '70 Chevelle; in late November 2015 and December of 2015, Jason texted regarding additional repair work Bain requested on the '66 Chevelle that would be completed at Bain's house; on December 16, 2015, Bain requested an update on the status of the '70 Chevelle and said he needed it "over the holidays at the latest[]" to which Jason responded five days later that he would call Bain; on January 4, 2016, Jason texted that he had been sick but was "try[ing] to finish up" the '70 Chevelle that week; and on January 12, 2016, Jason texted that he was going to rebuild the '70 Chevelle's carburetor because it was leaking gas. Bain testified that he continued to text in 2017 and 2018 checking on the status of the '70 Chevelle despite Jason's indications in November of 2015 and January of 2016 that the car was very near completion. According to Bain and the texts admitted at trial, he asked Jason in September of 2018 to see the car in

8

person to take photographs and get an odometer reading for insurance purposes. Bain testified that he had asked Jason to allow him to get the photographs and odometer reading for insurance purposes since 2016 and that for three consecutive years—from 2016 to 2018—Bain did not get the photographs despite his demanding the photographs from Jason. According to Bain, he had multiple in-person meetings with Jason after Wayne died, but those meetings were at Bain's house because Jason would not allow Bain on the property. From 2013 to when the car was recovered in 2019, Bain did not have access to the shop property, and there were occasions where he was "rebuffed" by Jason when Bain came out to the shop property for a "site visit[.]"

Bain recalled that Jason instructed Bain to make the checks out to Winn's Automotive in November of 2013 for the work done on the '70 Chevelle and that the checks were cashed, and the money was taken out of Bain's account. Bain testified that he expended a total of $17,500 for the restoration of the car, the restoration never occurred, and he did not know what work was done, who did the work, or when the work was done in exchange for the $17,500. The checks Bain wrote for the work on the '70 Chevelle totaling $17,500 were all made payable to Winn's Automotive prior to Wayne's death. Bain agreed that he did not know who endorsed the checks and they very well may have been deposited in the Winn's Automotive bank account. According to Bain, while he was waiting for the car to be

9

restored, nothing gave him reason to believe that the car was in the condition that it was when he recovered it in 2019. Bain recalled that Jason continued to tell him that the work on the car was proceeding and near completion. Bain testified that in 2018 he hired an attorney, Bourque, to attempt to recover the vehicle because Bain suspected that the work on the car was not done or unfinished. Bain testified that he was not allowed to see the car; that he relied on Jason's updates on the car; and that Bain's reliance on the updates caused Bain not to attempt to recover the car sooner. Bain agreed that he did not pay Mary or Jason any money from 2014 to 2019 for the work on the car, he never advanced Mary or Jason money for work on the car after Wayne died, and he had suspicions going back to 2014 that Jason was not being honest with him about fixing the car and in the "beginning of 2014 . . . [Bain] became concerned about excuses, non-access to the vehicle[.]" Bain agreed that nearly every year since 2014 he indicated that he was going to keep pursuing private investigators and law enforcement activities to get access to his car. Bain agreed that the texts admitted at trial include a text from Bain to Jason on April 15, 2015, six years before filing the lawsuit, when Bain stated, "Hey, Jason, do I need to get my private investigator as I did before?" and Bain agreed he threatened to call law enforcement then. Bain testified that after Jason continued to make excuses that Bain did not believe, Bain threatened in 2016 to file suit and get law enforcement involved. Bain recalled that after Jason continued to make more excuses, Bain threatened in 2017

10

to file suit and get law enforcement involved. Bain also agreed that nothing in the text messages admitted at trial evidenced that he had requested a photograph or odometer reading at any time prior to 2018.

Bain recalled that he recovered the car in March of 2019 and the car had "clearly been damaged by flood water[]" with flood debris inside the car and on top of the motor; the car was "in primer[;]" no interior work had been done on the car; the wheels, tires, bumpers, and stainless molding were missing; and the interior of the car was "completely trashed." Bain agreed that there was extensive flooding in Montgomery County in 2017. According to Bain, who had forty-five years of experience in hydrology, the car's condition upon recovery indicated water damage, the mechanical teardown revealed waterborne debris, and Bain observed water in places in the car that water could not have been if the car had not been flooded— such as inside the exhaust system. Bain explained that he was unable to discover the car's condition prior to March of 2019 because he was not allowed on the property and "there was no indication through any communication that the car was anything but in the very last stages of complete restoration." Bain recalled that, prior to Wayne's death, Bain could access the Winn's Automotive property, but that after Wayne's death, Bain did not have the same access. Bain explained that, after Wayne's death and prior to the recovery of the car in 2019, Bain never saw the car. Bain testified that he believed that, because Jason was an employee of his father's

11

business and because of Jason's communications with Bain, Jason should be responsible for all of the activity that Bain expected Wayne to perform on the car. According to Bain, he made repeated and countless attempts through phone calls and texts to get access to the car in June of 2014 and retained a private investigator to find out about the status of the car and ultimately hired an attorney in 2018 to write a demand letter for the car's return. Bain recalled that after Jason or Mary did not respond to the letter, he worked with the attorney to recover the car with law enforcement's assistance, the Montgomery County Sheriff's Department recovered the car from the property, and Bain picked it up. A certified copy of a response to Bain's request for information from the Montgomery County's Sheriff's Office indicating that Bain reported to law enforcement on December 5, 2018, that the car had been stolen and that the Sheriff's Department recovered the car on March 5, 2019, from Jason, was admitted into evidence. Bain testified that since he recovered the car in 2019, work is still being done on the car and it is not finished. Bain agreed that neither Mary nor Jason had done anything over the past three years to stop Bain from fixing up his car or enjoying it. Bain agreed that he did not file suit until March of 2021, at least six years after Wayne's death, at least three years after he sought legal advice on the matter, and approximately two years and eleven months after his lawyer sent the demand letter.

According to Bain, since the time of the car's recovery, he has spent almost $20,000 on restoring the mechanical condition of the car, and he estimated the cosmetic damages to the car at $84,000, but he explained that this amount would not restore the car to the condition that it was in when it was delivered to Winn's Automotive.

Testimony of Morgan Bourque

Morgan Bourque testified that he charged Bain $1,200 for his services and he was able to ultimately assist Bain in recovering his vehicle. Bourque could not recall when the vehicle was recovered. According to Bourque, the only letter that he wrote for Bain was the April 10, 2018, letter and he called the District Attorney's Office, the Sheriff's Office, and the Constable's Office. Bourque testified that he also drove out to Winn's Automotive, but he did not get a response from any of the Defendants in the case regarding the car.

Testimony of Liz Colwell

Liz Colwell, a private investigator and process server, testified that Bain hired her in 2014. According to Colwell, Bain hired her to find a car that was "missing in action" and "find the people involved." Colwell recalled that Bain had given her the names of Mary Winn and Mary's son, Jason Winn, and Colwell initially tried to go to the Winn's property in late 2014 to see the car and to get a picture of the odometer for insurance purposes. Colwell testified that the first time she went to the property

13

the gate was locked, there was a no trespassing sign, and she was initially unable to contact Mary or Jason. When she was getting ready to leave, a vehicle exited the gate, Jason got out of the vehicle and locked the gate, and Colwell was able to speak to Jason. According to Colwell, she told Jason she wanted to see the car and Jason said that he was too busy that day. Jason said he lost Bain's phone number and asked Colwell for the number, and Colwell provided him the number.

Colwell recalled that she made several more attempts to go to the property and then talked with Mary Winn on many occasions once she learned where Mary lived. According to Colwell, she told Mary the significance of the fact that there was no insurance on the car and tried to convince Mary to let her go on the property with Mary or Jason to get a picture of the car's odometer. Colwell testified that Jason "said all kinds of things were being done with the car[]" and he would not give Mary a key to the property. Colwell talked to Mary over the phone, texted her, and went to where she was living to talk to her, but to no avail. Colwell continued to update Bain from 2014 to 2019 and reported to him annually her findings about her lack of progress getting access to the car.

Colwell recalled that she also continued to try and contact Jason about getting access to the car, and only sometimes would Jason answer his phone. On one occasion, when Colwell asked Jason if he would let her go to the property with him the next time he went to the property, Jason told her he was in Mississippi with a

14

"broken down" trailer and would let her know when he got back. She never heard back from him. According to Colwell, the last time she worked for Bain was in April of 2018 when she delivered to Mary and Jason demand letters Bourque had drafted demanding the return of the car. Colwell testified that Mary and Jason had adequate notice that Bain wanted his car back. Colwell recalled that she charged Bain $85 an hour, but she could not remember the total amount that she had billed Bain. Colwell testified that at no time during the years that she worked for Bain did she or Bain get access to the car.

Testimony of Mary Winn

Mary testified that before her husband, Wayne, passed away, he operated the business Winn's Automotive. According to Mary, she did not participate in the business in any way when Wayne was alive. Mary recalled that after Wayne passed away, Bain wrote a $561 check to Mary instead of Winn's Automotive for a final payment for the work done on the '66 Chevelle because the "bank account was frozen[]" after Wayne died.

As for the '70 Chevelle, Mary recalled that Wayne had picked up the car on a wrecker, brought it to the shop, stripped it down, started working on it, and after the car "was in primer" her husband passed away. Mary testified that the car was at Winn's Automotive until the Sheriff's Department came and got it, and that she had no knowledge of any damage to the car. According to Mary, prior to the Sheriff's

15

Department taking the car, Jason told her that he and Bain had talked about getting the car back or having more done to the car. Mary testified that before the Sheriff's Department came and got the car, Colwell called Mary and said that Bain was concerned and wanted his car back, and then Colwell also came out to "the house" and spoke with Mary. Mary testified that she did not do anything to stop Bain from recovering his car at any time after Wayne's death.

Mary explained that she owns the property where the car was stored, and she never barred Jason from accessing the property. Mary testified that Wayne "chained the fence up" on the property where the house and shop are located when he bought the property, and that after Wayne passed, she and Jason have keys to the fence. According to Mary, she has "not been really in the shops" on the property and the last time she personally saw the car on her property might have been when Wayne was still alive. Mary testified that the pinecones, pine needles, and dirt depicted on the car in the photographs from when the car was returned to Bain could have resulted from the car being parked in a covered place in a part of the shop that is "open[]" to the elements. Mary agreed that if the car was stored outside, she would have seen it on her visits to the shop.

According to Mary, any money deposited into a bank for the business was not accessible to her because the bank account was "frozen" as soon as Wayne passed away, and she still had no access to the account at the time of trial.

16

Testimony of Jason Winn

Jason Winn testified that prior to picking up Bain's '70 Chevelle, Jason worked alongside his father repairing vehicles at Winn's Automative for years. According to Jason, when he and his father picked up the '70 Chevelle, the car did not run, and the brakes did not work. Jason recalled that he helped his father try to get it running but "something was still wrong . . . [i]t was still popping through the carburetor." Jason testified that after that, and while his father was still alive, Jason "was pretty much done with [the car]." According to Jason, his father was the primary one that worked on the car after that and that he pulled it apart, stripped it to bare metal and did "body work . . . patchwork . . . and metal work to it[]" until he passed away. Jason stated that, from the pictures of the car from when Bain recovered it in 2019, it was evident that the paint had been taken off and "that the car ha[d] been worked on[]" and it was "not like it just sat there."

Jason testified that he was paid for the work he did on the 2002 Corvette, and that although he asked for payment for the work because "[they] were done with it[,]" he did not endorse or cash the check to Winn's Automotive in November 2013 for that work because there was no way he could cash a check made payable to Winn's Automotive. Jason testified that he did not have banking privileges at Winn's Automotive and that he was paid by his father in cash for the work that he did. As for the '70 Chevelle, Jason agreed that Bain had paid $17,500 to Winn's Automotive

17

for the work on the car, but Jason testified that his father received the payments and Jason did not feel responsible to Bain for the work he had paid Jason's father for. According to Jason, he was overwhelmed when his father passed away, that when he was texting Bain that he was almost done with the work on the car he was trying to finish multiple cars that his father had been working on, and that Jason stopped working on the '70 Chevelle when Bain insisted that Jason work only on the '70 Chevelle. Jason testified that he communicated to Bain that he was no longer going to work on the car numerous times on the phone and in person, but Jason agreed at trial that he did not have any documentary proof that he communicated that to Bain. According to Jason, the company he was working for at the time of trial he had been working for since 2015 or 2016, and that when he started working for that company he was also doing "side projects" to finish up his father's business. Jason testified that the car had never been flooded, that the car was inside the shop the entire time it was under his care, and that its condition was a result of "just sitting around for that many years." Jason explained that the car "sat around" for that many years because he wanted to work on the car but was not asking Bain for any money and had never asked him to pay for the work he was doing on the car. Jason testified that he had texted Bain that the car was almost complete when he knew that it was not because he was trying to buy some time because he wanted to do more work on the

18

car. According to Jason, Bain made him feel obligated to finish the work for which Bain had paid Jason's father.

According to Jason, his mother and father lived on the same property as the Winn's Automotive shop and that part of the property flooded in 2016 or 2017, but that the '70 Chevelle was parked on the portion of the property that did not flood. Jason testified that the $17,500 paid was not to completely "restore" the car because that involves a lot more work than painting a car and putting in new interior and requires "taking the car completely apart and starting from the ground up[;]" that his father was only paid "to paint a car and to put interior in it[;]" and it would cost approximately $33,000 to get the car back to the condition it was in when Jason and his father picked it up. According to Jason, his father was responsible for the condition of the car when it was returned to Bain, and that even though he told Bain in 2018 that the car was almost done, his father may have told Bain "a lot more got done than what got done." Jason testified that he never charged Bain for work he did not do to the car and that Bain never paid him for work he did not do to the car. Jason recalled that after his father passed away, there was never a time where Jason was requested to allow Bain on the property to retrieve the car, and that the locks on the gate on the property were placed there by his father. Jason agreed that when he received a call that Bain was demanding that his car be picked up, he towed the car

19

to the fence for the "truck sitting out waiting on it[,]" and after receiving the demand letter from Bain's attorney in 2018, Jason did not stop Bain from retrieving his car.

Standard of Review

In a bench trial, the trial court determines the credibility of the witnesses and the weight to be given their testimony. *Forest Hills Improvement Ass'n v. Flaim*, No. 09-15-00478-CV, 2017 Tex. App. LEXIS 10528, at *5 (Tex. App.—Beaumont Nov. 9, 2017, no pet.) (mem. op.) (citing *Woods v. Woods*, 193 S.W.3d 720, 726 (Tex. App.—Beaumont 2006, pet. denied)). In resolving factual disputes, the trial court may believe one witness and disbelieve others, and it may resolve any inconsistencies in a witness's testimony. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986). In making credibility determinations, the factfinder "cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *City of Keller v. Wilson*, 168 S.W.3d 802, 820 (Tex. 2005). The factfinder is also not "free to believe testimony that is conclusively negated by undisputed facts." *See id.* However, if the factfinder could reasonably believe the testimony of one witness or disbelieve the testimony of another witness, the appellate court "cannot impose [its] own opinions to the contrary." *See id.* at 819. When, as here, the trial court makes findings of fact and conclusions of law, an appellate court reviews the trial court's

20

legal conclusions de novo and fact findings for evidentiary support. *See City of Beaumont v. Spivey*, 1 S.W.3d 385, 389 (Tex. App.—Beaumont 1999, pet. denied).

A trial court's findings of fact in a bench trial carry the same weight as a jury's verdict, and we review the evidence supporting them under the same standards for determining if sufficient evidence supports a jury answer. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Sheetz v. Slaughter*, 503 S.W.3d 495, 502 (Tex. App.—Dallas 2016, no pet.). Findings of fact supported by the evidence are binding if the appellate record contains a reporter's record. *Sheetz*, 503 S.W.3d at 502. For a factual-sufficiency challenge, we consider and weigh all the evidence in a neutral light and set aside the finding only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Morris v. Wells Fargo Bank, N.A.*, 334 S.W.3d 838, 842 (Tex. App.—Dallas 2011, no pet.). We may not substitute our judgment for that of the factfinder if the evidence falls "within [the] zone of reasonable disagreement." *See City of Keller*, 168 S.W.3d at 822; *Sheetz*, 503 S.W.3d at 502.

We review the trial court's conclusions of law de novo and will affirm if the trial court correctly drew the legal conclusion from the facts. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002); *Sheetz*, 503 S.W.3d at 502. We will reverse the trial court's judgment only if the conclusions of law are erroneous as a matter of law. *Sharifi v. Steen Auto., LLC*, 370 S.W.3d 126, 148 (Tex.

App.—Dallas 2012, no pet.). We must uphold conclusions of law if "any legal theory supported by the evidence sustains the judgment." *Id.* (quoting *Bundren v. Holly Oaks Townhomes Ass'n*, 347 S.W.3d 421, 430 (Tex. App.—Dallas 2011, pet. denied)); *see also Samson Expl., LLC v. T.W. Moak & Moak Mortg. & Inv. Co.*, No. 09-18-00463-CV, 2020 Tex. App. LEXIS 443, at *20 (Tex. App.—Beaumont Jan. 16, 2020, no pet.) (mem. op.).

Generally, an appellant must direct an attack on the sufficiency of the evidence at specific findings of fact and conclusions of law rather than at the judgment as a whole. *Shaw v. Cnty. of Dallas*, 251 S.W.3d 165, 169 (Tex. App.—Dallas 2008, pet. denied). Unchallenged findings "are binding on an appellate court unless the contrary is established as a matter of law, or if there is no evidence to support the finding." *McGalliard*, 722 S.W.2d at 696.

## Finding of No Contract between Bain and Jason

In issue one, Bain argues the trial court erred when it found there was no contract between Bain and Jason. According to Bain, a bailment contract existed between him and Jason after Wayne died. Bain argues that, even if no bailment existed, Jason promised to perform the work on the car and should be estopped from claiming no agreement existed and should be liable to Bain for the amount to put

Bain back in the condition he was in prior to his detrimental reliance on Jason's alleged promise.[3]

"The basic elements of a bailment are: (1) the delivery of personal property by one person to another in trust for a specific purpose; (2) acceptance of such delivery; (3) an express or implied contract that the trust will be carried out; and (4) an understanding under the terms of the contract that the property will be returned to the transferor or dealt with as the transferor directs." *Sisters of Charity of the Incarnate Word, Houston, Texas v. Meaux*, 122 S.W.3d 428, 431 (Tex. App.—Beaumont 2003, pet. denied). "Claims for breaches of bailment agreements generally can be brought as contract or tort claims depending on the particular facts of the case and the type of action the plaintiff chooses to assert." *Barker v Eckman*, 213 S.W.3d 306, 310 (Tex. 2006).

According to Bain, he delivered his '70 Chevelle to Jason because the physical possession of the car transferred from Winn's Automotive to Jason after Wayne died, the delivery was for the specific purpose in that Bain and Jason intended for Jason to paint and repair the interior of the car, Jason accepted the delivery of the car so he could perform the work thereby creating an implied contract between Bain and Jason, and Bain and Jason agreed that the car would be returned to Bain when

---

[3] Because of our disposition of Bain's second issue, we need not address this argument. *See* Tex. R. App. P. 37.1.

the work was completed. Bain asserts that Jason breached the bailment contract when he failed to complete the work, Bain relied on Jason's misrepresentations to Bain's detriment, and Jason was negligent in failing to take reasonable care in safeguarding the car.

The trial court included the following conclusion in its Findings of Fact and Conclusions of Law:

> [] **Winn's Automotive Is Nothing More Than a Name.** Mr. Bain's position was that Winn's Automotive was responsible for the car, never understanding that Winn's Automotive is nothing more than an assumed name. In fact, he sued Jason Hardy Winn and Mary Ann Winn as owners of Winn's Automotive, as though it was an entity. It wasn't. But even if it was an entity, then the lawsuit and liability would be against that entity, not against the individuals who have ownership interests in it. In fact, the corporate veil would shield them from such personal liability. Put simply, whether an assumed name or entity, Winn's Automotive creates no liability for Wayne Winn's survivors. The contract for the car was between Mr. Bain and Wayne Winn, no one else. When Wayne Winn died, the contract died with him. Although Jason Hardy Winn volunteered to complete the car, he was offered no consideration to do so, such that his plan was a gift, not a contract. Mary Ann never promised anything regarding the car and had no obligations as to it.

Bain does not challenge the trial court's conclusion that Winn's Automotive is nothing more than an assumed name and is not a business entity. The record demonstrates that Jason was offered no consideration to perform work on the car after Wayne died and that the contract for the work on the car was only between Bain and Wayne. The record also supports the trial court's conclusion that Jason's efforts to complete the work on the car were merely

24

voluntary. Bain testified that there was no discussion about payments for the '70 Chevelle because Bain had already paid $17,500 for the work on the car. The checks Bain wrote for the work on the '70 Chevelle totaling $17,500 were all made payable to Winn's Automotive prior to Wayne's death. Jason testified that Bain had paid $17,500 to Winn's Automotive for the work on the car, that his father received the payments, and that Jason did not feel responsible to Bain for the work he had paid Jason's father for. Bain explained at trial that Jason never claimed that he needed to be paid separately or for additional work on the car. Bain agreed that he did not pay Mary or Jason any money from 2014 to 2019 for the work on the car, and he never advanced Mary or Jason money for work on the car after Wayne died. Jason explained that the car "sat around" for that many years because he wanted to work on the car but was not asking Bain for any money and had never asked him to pay for the work he was doing on the car. Accordingly, no implied contract or bailment existed between Jason and Bain. The trial court did not err in finding no contract existed between Jason and Bain. We overrule issue one.

Statutes of Limitations

In issue two, Bain argues that the trial court erred in calculating the statutes of limitations for his breach of contract, negligence, promissory estoppel, and fraud claims. In its conclusions of law, the trial court determined that limitations barred all

25

of Bain's claims. In so concluding, the trial court provided a chart that listed each of Bain's claims, and for each claim, the chart listed: the applicable statute of limitation, the earliest accrual date for the claim and the date the claim would be barred by the limitations for that earliest accrual date;[4] and the latest possible accrual date for that claim and the date the claim would be barred by limitations assuming the latest possible accrual date applied. On appeal, Bain does not challenge the trial court's findings of the applicable statute of limitation for each claim, but instead challenges the accrual dates used by the trial court to calculate limitations for his breach of contract, negligence, promissory estoppel, and fraud causes of action. Bain argues the earliest accrual date for his breach of contract claim, promissory estoppel, and fraud claims is April of 2018, when he lost faith that Jason or Mary would perform the work on the car and Bain demanded return of the car. According to Bain, he could not have discovered that he sustained an injury before April of 2018, and that Jason and Mary fraudulently concealed the car and its condition prior to Bain demanding the car's return in 2018. As for his negligence claim, Bain contends that the earliest accrual date is March of 2019, when the car was returned to him. Bain asserts that not until March of 2019, was he able to discover the nature of his injury.

---

[4] We note that the chart also includes earlier possible accrual dates for Bain's causes of action, but we need not determine the exact date of accrual because the lawsuit was filed well outside the limitations period. *See Tectonic Realty Inv. Co. v. CNA Lloyd's of Texas Ins. Co.*, 812 S.W.2d 647, 654 (Tex. App.—Dallas 1991, writ denied).

Generally, a cause of action accrues when facts come into existence authorizing a claimant to seek a judicial remedy. *See Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex. 1990); *Robinson v. Weaver*, 550 S.W.2d 18, 19 (Tex. 1977). The limitations chart the trial court included in its Findings of Fact and Conclusions of Law provides, in relevant part, the following:

| Cause of Action | Latest Possible Accrual Date | Latest Possible Bar Date |
|---|---|---|
| Breach of Contract | April 15, 2015<br>This is the date the return of the car was demanded, but the car was not delivered. | April 15, 2019 |
| Negligence | August 2017<br>Mr. Bain complains that the car was flooded when returned and it was negligent to allow the car to flood. There were 3 floods during the time the car was not in Mr. Bain's possession: Tax Day and Memorial Day Floods both in 2016 and Harvey in August 2017. | August 2019 |
| Promissory Estoppel | April 15, 2015<br>This is the date the return of the car was demanded, but the car was not delivered. | April 15, 2019 |
| Fraud | March 30, 2015<br>When Mr. Bain began sending angry texts to Jason Hardy Winn, he knew or should have known something was wrong. (The Court notes that Mr. Bain said he had actually sent these in prior years, too, but that a technical problem with his prior phone kept him from presenting those texts as evidence.) | March 30, 2019 |

The findings of fact unchallenged by Bain include the following, in pertinent part:

[] By 2013, Mr. Bain became concerned that he had not received the car. In a series of texts and conversations with Jason [] from March 30, 2015 through September 2018, Mr. Bain demanded information about the car or the return of the car. The information Jason [] provided about the status of the car was untrue and the car was not returned.

[] In 2014, Mr. Bain lost faith in what Jason [] told him about the car. He hired a private investigator in 2014 in an attempt to gain information about the car and/or retrieve it.

　　a. In 2014, Mr. Bain sent his private investigator to take pictures of the car and its odometer for insurance purposes. She was denied access. She reported this to Mr. Bain. Mr. Bain did not file suit.

　　b. In 2015, Mr. Bain's private investigator continued to try to take pictures of the car and its odometer for insurance purposes. She was denied access. She reported this to Mr. Bain. Mr. Bain did not file suit.

　　c. In 2016, Mr. Bain's private investigator continued to try to take pictures of the car and its odometer for insurance purposes. She was denied access. She reported this to Mr. Bain. Mr. Bain did not file suit.

　　d. In 2017, Mr. Bain's private investigator continued to try to take pictures of the car and its odometer for insurance purposes. She was denied access. She reported this to Mr. Bain. Mr. Bain did not file suit.

　　e. In 2018, Mr. Bain's private investigator continued to try to take pictures of the car and its odometer for insurance purposes. She was denied access. She reported this to Mr. Bain. Mr. Bain did not file suit.

[] In addition to the private investigator, Mr. Bain began threatening Jason [] with a lawsuit or with calling law enforcement.
　　a. Beginning on April 15, 2015 and continuing throughout 2015, Mr. Bain threatened Jason [] with filing a lawsuit and with calling

law enforcement if the car was not returned. The car was not returned. Mr. Bain did not file a lawsuit or contact law enforcement.

b. Throughout 2016, Mr. Bain threatened Jason [] with filing a lawsuit and with calling law enforcement if the car was not returned. The car was not returned. Mr. Bain did not file a lawsuit or contact law enforcement.

c. Throughout 2017, Mr. Bain threatened Jason [] with filing a lawsuit and with calling law enforcement if the car was not returned. The car was not returned. Mr. Bain did not file a lawsuit or contact law enforcement.

[] Mr. Bain hired an attorney in 2018 to send a demand letter seeking the return of the car. The April 10, 2018, demand letter yielded no results. Mr. Bain did not file a lawsuit or contact law enforcement.

[] In 2019, after six years of suspicion that something was wrong with the car, Mr. Bain finally reported the car as stolen. With the assistance of law enforcement and the courts, Mr. Bain had the car returned to him. The car was returned in a state of salvage. Mr. Bain, who is not an expert and was not designated as such, described the cost of repair as being $20,000.00 for mechanical work and $84,000.00 to date for cosmetic work, with more to be done. Jason [], who was qualified as an expert, disputed the amount and said he would charge $72,000.00. Jason [] was never asked and, thus, never said that he would charge what was reasonable and necessary for the repairs to the car.

Because these unchallenged findings of fact are supported by testimony and evidence presented at trial, these findings are binding on our Court. *See McGalliard*, 722 S.W.2d at 696. We disagree with Bain's position that the earliest accrual date for his breach of contract claim, promissory estoppel, and fraud claims is April of 2018, and that the earliest date for his negligence claim is March of 2019. According to the record, Bain, because he was suspicious about the car's status at the beginning

29

of 2014, hired a private investigator to try to get access to the car. Also, Bain sent Jason texts from late March of 2015 through September of 2018 inquiring into the status of the vehicle, and in some of the texts he demanded the return of the car. There was flooding in Montgomery County while the car was at the shop in 2016 or 2017. In April of 2015, Bain began threatening Jason with filing suit and calling law enforcement if the car was not returned and it was not returned. Bain did not challenge the trial court's finding that, beginning on April 15, 2015, Bain threatened Jason with filing a lawsuit and with calling law enforcement if the car was not returned. The car was not returned, and Bain did not challenge the trial court's finding that the latest of the applicable flooding events while the car was at the shop was Hurricane Harvey in August of 2017. We conclude the trial court properly determined the latest possible accrual dates for Bain's breach of contract, negligence, promissory estoppel, and fraud claims had passed prior to suit being filed. In addition, we conclude that the trial court did not err in calculating limitations or in determining that the claims were barred by limitations. Issue two is overruled.

Exclusion of Bain's Damages Expert

In his third issue, Bain argues the trial court erred in excluding his damages expert from testifying. Because of our disposition of issues one and two, we need not address issue three. *See* Tex. R. App. P. 47.1.

We affirm the trial court's judgment.

AFFIRMED.

JAY WRIGHT
Justice

Submitted on August 19, 2024
Opinion Delivered December 12, 2024

Before Golemon, C.J., Wright and Chambers, JJ.

31